# IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE

| | | |
|---|---|---|
| BLACK HORSE CAPITAL, LP, BLACK HORSE CAPITAL MASTER FUND LTD., OURAY HOLDINGS I AG, and CHEVAL HOLDINGS, LTD., | ) ) ) ) ) | |
| | ) | C.A. No. 8642-VCP |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| XSTELOS HOLDINGS, INC., (F/K/A FOOTSTAR, INC.) a Delaware Corporation, XSTELOS CORP., (F/K/A FOOTSTAR CORP.), a Texas Corporation, FCB I HOLDINGS, INC., a Delaware Corporation, and JONATHAN M. COUCHMAN | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Submitted: February 10, 2014
Decided: September 30, 2014

Elena C. Norman, Esq., James M. Yoch, Jr., Esq., Paul J. Loughman, Esq., YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Jonathan Sherman, Esq., Everett Collis, Esq., BOIES, SCHILLER & FLEXNER LLP, Washington, D.C.; *Attorneys for Plaintiffs*.

Paul J. Lockwood, Esq., Amy C. Huffman, Esq., Lori W. Will, Esq., SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Lauren E. Aguiar, Esq., SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendants*.

**PARSONS, Vice Chancellor.**

This is essentially an action for breach of contract. The plaintiffs and the defendants joined together to acquire a pharmaceutical company, and this dispute arose out of that acquisition. The plaintiffs allege that in the days and weeks leading up to the execution of the acquisition agreement, the defendants made an oral promise that they would transfer to the plaintiffs certain assets of the target company at some unspecified time post-closing. The plaintiffs allege that this oral promise was a central precondition to their willingness to make a short-term bridge loan that was necessary to finance the acquisition. On the day the acquisition agreement was executed, a series of written agreements were signed by the parties pertaining to various aspects of the transaction, including financing and the post-closing operation and management of the holding company through which the plaintiffs and the defendants took ownership of the target. Those written agreements, however, make no reference to any prior promise or agreement like the one alleged by the plaintiffs. Furthermore, the written agreements contain integration clauses in which the parties to them agreed that the documents evidenced the entirety of their agreement and understanding with respect to the subject matter of those agreements.

The plaintiffs charge the defendants with breach of contract for failing to make the asset transfer according to the prior oral agreement. They also assert claims for fraudulent inducement, promissory estoppel, and unjust enrichment. The defendants have moved to dismiss, arguing that, taking all alleged facts as true, the complaint fails to state a claim under any of these theories. The defendants primarily contend that the written agreements preclude this action for alleged breach of the prior oral promise.

The plaintiffs also allege breaches of the written acquisition agreements themselves. In that regard, the plaintiffs assert claims for breach of contract and of the implied covenant of good faith and fair dealing independent of the oral promise they seek to enforce in the principal counts of the complaint. The defendants seek dismissal of those claims as well.

This Memorandum Opinion constitutes my ruling of the defendants' motion to dismiss pursuant to Rule 12(b)(6). Having considered the record before me on that motion and the parties' arguments, I conclude that, as to the alleged prior oral agreement, the plaintiffs have failed to state a claim upon which relief can be granted, and I dismiss the plaintiffs' claims for breach of contract as well as those for fraudulent inducement, promissory estoppel, and unjust enrichment. As to the allegations concerning certain of the written acquisition agreements, the plaintiffs adequately have pled claims for breach of contract, but not for breach of the implied covenant of good faith and fair dealing, with one limited exception. The defendants' motion to dismiss, therefore, is granted in part and denied in part.

## I.    BACKGROUND[1]

### A.    The Parties

Plaintiff Cheval Holdings, Ltd. ("Cheval Holdings") is a Cayman Islands corporation, the ultimate and sole owners of which are non-parties Dale and Mary

---

[1]    Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Verified Amended Complaint ("the Complaint"), together with its attached exhibits.

2

Chappell. Plaintiffs Black Horse Capital, LP and Black Horse Capital Master Fund Ltd. (together, "Black Horse") are private investment funds owned by the Chappells and other third party investors. Plaintiff Ouray Holdings I AG ("Ouray" and, collectively with Cheval Holdings and Black Horse, "Plaintiffs") is a Swiss corporation and is the successor in interest to Cheval Holdings's interest in several of the entities relevant to this action.

Defendant Jonathan M. Couchman is the majority stockholder, CEO, CFO, and Chairman of the board of directors of Defendant Xstelos Holdings, Inc. ("Xstelos Holdings"), a Delaware corporation. Defendant Xstelos Corp., a Texas corporation ("Xstelos," and together with Xstelos Holdings, the "Xstelos Entities"), is a wholly owned subsidiary of Xstelos Holdings. Xstelos Holdings and Xstelos were formerly known as Footstar, Inc. and Footstar Corp., respectively. Couchman was previously the Chairman and CEO of Footstar Corp. ("Footstar," and together with Footstar, Inc., the "Footstar Entities"), a Texas corporation.

Nonparty CPEX Pharmaceuticals, Inc. ("CPEX") is a Delaware corporation engaged in the development of drug absorption and delivery technology. CPEX is wholly owned by Defendant FCB I Holdings, Inc. ("FCB Holdings"), also a Delaware corporation. FCB Holdings, in turn, is owned by Xstelos Corp. (80.5 percent) and Ouray, formerly held by Cheval (19.5 percent). CPEX and FCB Holdings have the same three-member boards of directors, consisting of Couchman, nonparty Adam Finerman, and Dale Chappell. Couchman, the principal executive officer of CPEX, manages both CPEX and FCB Holdings.

3

## B.     Facts

### 1.     CPEX, Cheval Holdings, and Footstar

CPEX is a biotechnology company that manufactures a patented drug delivery technology known as CPE-215, which enhances the absorption of drugs through the nasal mucosa, skin, and eyes.  Since 2003, CPEX has received royalties from Auxilium Pharmaceuticals, Inc.'s marketing of Testim, a testosterone replacement therapy that utilizes the CPE-215 delivery technology.  In February 2008, CPEX entered into a license agreement with Allergan, Inc. ("Allergan") for the development and commercialization of another application of CPE-215, to be used in conjunction with Allergan's patented low-dose desmopressin, a synthetic hormone that assists in regulating kidney function for the treatment of nocturia and related conditions.  One drug product created by the combination of Allergan's synthetic hormone and CPEX's drug delivery technology is known as "SER-120."  It is at the heart of this dispute.

CPEX formerly was the drug delivery business segment of Bentley Pharmaceuticals, Inc.  After being spun off in June 2008, CPEX traded on NASDAQ under the ticker "CPEX."  As of mid-2009, Cheval Holdings was one of the largest stockholders of CPEX, which had a market capitalization of approximately $25.3 million. The Complaint alleges that Cheval Holdings was interested in expanding its investment in CPEX, and sought an opportunity to acquire its royalty-producing assets.[2]  In response

---

[2]     Compl.  ¶¶ 31-32.

to a solicitation of bids, Cheval Holdings unsuccessfully bid $75 million for CPEX in June 2010.

The Complaint states repeatedly that Cheval Holdings had the financial resources, pharmaceutical industry expertise, and willingness to acquire and manage 100 percent of CPEX in its own right.[3]  In that regard, I note that Dale Chappell holds both an M.D. and M.B.A., and Mary Chappell holds an M.D. and is a surgeon.  Black Horse, managed by the Chappells, has a "particular interest in acquiring or investing in biotechnology and related companies and assets."[4]  In evaluating its strategic options vis-à-vis CPEX, however, Cheval Holdings concluded that "the acquisition would be much more efficient if Cheval could bring in a co-investor with a substantial NOL."[5]

A $100 million "NOL," or net operating loss, was found when Chappell was put in touch with Couchman, then the Chairman and CEO of Footstar.  Footstar had operated shoe stores within Kmart locations and had emerged from a Chapter 11 bankruptcy reorganization in 2006.  Footstar, which the Complaint describes as "a financial failure,"[6] lost its Kmart contract in 2008.  It ultimately filed for liquidation in 2010, having "no

---

[3]     *Id.* ¶ 38; *see also id.* ¶¶ 5, 34, 41.

[4]     *Id.* ¶ 22.

[5]     *Id.* ¶ 35.  In their Complaint and briefing, Plaintiffs use the name "Cheval" to refer to Cheval Holdings and Black Horse, collectively.  This Memorandum Opinion does not use "Cheval" except, as here, when quoting from the Complaint.

[6]     *Id.* ¶ 2.

prospects for turn around"[7] and having been unable, up to that point, to put its substantial NOL to use.

In mid-2010, Cheval Holdings solicited Footstar's interest in participating in an acquisition of CPEX. At the time, Footstar faced the possibility of losing the value of its NOL, if the liquidation proceeded and Footstar was dissolved. It had "little cash, and no borrowing capacity or other capital, sufficient to invest in or purchase CPEX on its own."[8] According to the Complaint, Footstar recognized that its "main contribution to the potential acquisition was not technical, scientific, or intellectual property investing expertise. Its principal contribution was the putative tax benefit of its NOL."[9] "In a very real sense, then," the Complaint alleges, "the Chappells and the Cheval Plaintiffs rescued Couchman and Footstar from his prior business failures by harnessing those very failures to what appeared to be everyone's advantage."[10]

### 2. The CPEX acquisition

### a. Structure of the acquisition

Thus, Cheval Holdings and Footstar jointly pursued CPEX in the hope that a joint acquisition would yield a better return on investment if Footstar's NOL were available to offset CPEX's future income from royalty streams. To realize these tax benefits, Footstar would have to own more than 80 percent of CPEX in the post-merger entity structure.

---

[7] *Id.* ¶ 7.

[8] *Id.* ¶ 39.

[9] *Id.* ¶ 8.

[10] *Id.* ¶ 13.

FCB Holdings was created for these purposes. Footstar contributed $3,220,000 in cash to FCB Holdings in exchange for an 80.5 percent equity stake; Cheval Holdings contributed $780,000 for its 19.5 percent stake.[11] According to the Complaint, Cheval Holdings's and Chappell's economic rationale for the transaction was that, although Cheval Holdings would receive less income as a minority owner, the reduction would be "more than offset by the tax benefits of the NOL structure and other aspects of the deal ultimately reached with Couchman. (These included a consulting and advisory fee . . . and a shareholder agreement with minority protections for Cheval Holdings.)"[12]

On August 24, 2010, Cheval Holdings and Footstar submitted to CPEX an indication of interest in acquiring all outstanding shares of CPEX common stock in a merger for $29.00 per share in cash. After nearly five months of negotiations with CPEX, on January 3, 2011, a definitive Agreement and Plan of Merger ("the Merger Agreement") was executed whereby FCB Holdings's subsidiary, FCB I Acquisition Corp., acquired 100 percent of CPEX's common stock in exchange for $27.25 per share.[13]

Also executed on January 3, 2011 were four other agreements concerning the CPEX acquisition and the parties' subsequent relationship: (1) a consulting and advisory services agreement between Footstar and Cheval Holdings (the "Consulting

---

[11]     Compl. Ex. C ("the Stockholders' Agreement"), at 1.

[12]     Compl. ¶ 43.

[13]     Compl. Ex. A (the "Merger Agreement"), at 4.

7

Agreement");[14] (2) a stockholders' agreement between Footstar, Cheval Holdings, and FCB Holdings (the "Stockholders' Agreement");[15] (3) a written commitment by Black Horse to provide FCB Holdings with bridge financing (the "Commitment Letter");[16] and (4) a $64 million secured loan to a subsidiary of FCB Holdings, funded by a consortium of lenders with Bank of New York Mellon as administrative agent (the "BNYM Loan").[17] Because the first three of these writings are integral to this dispute, and they were executed on the same day as the Merger Agreement, I briefly identify them here. To the extent relevant, their terms and import will be discussed in greater depth below.

b.      Financing the acquisition—and the "Serenity Agreement"

During initial discussions concerning the CPEX acquisition, the parties contemplated financing the transaction through FCB Holdings's $4 million in equity, plus acquisition financing of $64 million from the BNYM Loan. The BNYM Loan was to be

[14]    Compl. Ex. B (the "Consulting Agreement").

[15]    Compl. Ex. C (the "Stockholders' Agreement").

[16]    Huffman Transmittal ("Trans.") Aff. Ex. A (the "Commitment Letter"). Although the Commitment Letter is not attached to the Complaint, it and its subject, the $10 million Bridge Loan, are integral to Plaintiffs' claims and are referenced repeatedly in the Complaint. Thus, I may consider it at the motion to dismiss stage. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[17]    The BNYM Loan is not included in any of the parties' submissions to the Court. It is referenced, however, in the Complaint (¶¶ 51, 52, 65), the Merger Agreement (Recitals; §§ 3.7, 6.13, 9.6), the Stockholders' Agreement ("Background"), and the Bridge Loan Agreement (§ 3). It may be debatable whether the BNYM Loan is "integral" to the Complaint and, therefore, appropriate for consideration at this stage. I need not decide that issue, however, because I refer to the BNYM Loan only by way of background and do not rely upon it for purposes of any decision I reach.

8

funded into escrow before the closing to alleviate CPEX's concerns about transaction closing uncertainty. In December 2010, however, the lead lender in the BNYM Loan consortium, Athyrium Capital, balked at the pre-closing escrow condition. CPEX, however, resisted proceeding without it. CPEX insisted that, in the absence of funding into the escrow, the Merger Agreement include a specific performance remedy. In addition, CPEX sought financial security for the specific performance remedy, in case the merger failed to close and CPEX had to invoke it.

Chappell and Couchman, on behalf of their respective companies, discussed ways to salvage the deal.[18] Their solution was to scrap the escrow and loan $13 million in bridge financing directly to FCB Holdings to secure the specific performance remedy. According to the Complaint, the most Footstar could contribute toward such a bridge loan was $3 million. The Complaint repeatedly suggests, however, that Footstar "should have"[19] funded $10,465,000 (or 80.5 percent) of the $13 million bridge loan, based on the equity ownership ratio. As a result, Plaintiffs allege that: "Cheval and Chappell had a choice. They could walk away from the deal, return to their plan to attempt to purchase the equity of CPEX outright; or they could salvage the transaction with Footstar by pledging vastly more in bridge loans than was consistent" with the FCB Holdings's

---

[18]     Compl. ¶ 54.

[19]     *Id.* ¶ 56. *See also id.* ¶¶ 9, 54, 55, 57, 58, 61, 62, 64.

equity ownership ratios, thereby placing Cheval and Chappell at "a disproportionate risk" of losing the bridge loan funds if the transaction did not close.[20]

This brings us to the gravamen of this case. Plaintiffs allege that in a December 2010 phone conversation, Chappell offered to have Black Horse put up $10 million of the $13 million needed for bridge financing, if Couchman would give "100% of Serenity" to "Cheval" after the merger's closing.[21] "Serenity" is an asset not defined directly in the Complaint or any of the relevant written agreements, but which apparently includes the CPE-215 application mentioned at the outset of this Memorandum Opinion known as SER-120. "Serenity" and SER-120 are discussed in more detail below.

It is sufficient here to note that, during the December 2010 discussions concerning the bridge financing arrangement for the CPEX acquisition, Chappell asked for "100% of Serenity" in exchange for making what Plaintiffs suggest was a disproportionately large bridge loan commitment. During a mid-December phone conversation, Couchman declined this offer, but proposed an 80 percent to 20 percent split of "Serenity" in favor of "Cheval" in a "mirror image" of FCB Holdings.[22] Chappell, "on behalf of Cheval," agreed to the 80/20 Serenity split. According to the Complaint, Black Horse then

---

[20]     *Id.* ¶ 56.

[21]     Compl. ¶ 57. As noted and discussed more fully *infra* at Section I.B.3.b, the precise persons and entities to be involved in this part of the transaction are described differently at different paragraphs in the Complaint.

[22]     *Id.* ¶ 58.

promised to fund $10 million of the bridge loans "in consideration for, and in reliance on," this alleged oral "Serenity Agreement."[23]

On January 3, 2011, when the Merger Agreement was executed, Black Horse and Footstar entered into separate commitment letters with FCB Holdings and CPEX. Pursuant to those letters, the bridge financing was pledged to FCB Holdings in two parts of $10 million and $3 million by Black Horse and Footstar, respectively.[24] The acquisition closed on or about April 4, 2011, after being approved by a vote of CPEX's stockholders. Based on an agreement dated April 5, 2011 (the "Bridge Loan Agreement"), Black Horse made good on its commitment and loaned $10 million to FCB Holdings.[25] Presumably, Footstar similarly made its bridge loan, and the main financing consortium funded the primary loan to FCB Holdings, because the Merger was effectuated and FCB Holdings took 100 percent control of CPEX in early April 2011.

### 3. SER-120, "Serenity," and the "Serenity Agreement"

Before continuing to chronicle the material facts in this case, I pause to delineate the Complaint's allegations concerning SER-120 and the alleged Serenity Agreement. The parties' principal dispute centers on these facts. Broadly, it is alleged that Couchman orally promised Chappell that, in exchange for Chappell's putting up the $10 million

---

[23] *Id.* ¶ 62.

[24] Commitment Letter 1.

[25] Huffman Trans. Aff. Ex. D ("the Bridge Loan Agreement"). As with the Commitment Letter, I may consider the Bridge Loan Agreement at the motion to dismiss stage because it and its subject, the $10 million Bridge Loan, are integral to Plaintiffs' claims and are referenced repeatedly in the Complaint. *See Santa Fe Pac. Corp.*, 669 A.2d at 69-70.

Bridge Loan, Chappell would be given a greater interest in "Serenity" post-merger. To facilitate my analysis of the legal arguments raised for and against Defendants' motion to dismiss, I begin by reviewing certain of the Complaint's allegations regarding "Serenity" in more detail.

### a. The assets to be transferred under the Serenity Agreement

As noted *supra*, SER-120 is "one particular use"[26] of the CPE-215 technology, which involves combining it with a synthetic hormone called low-dose desmopressin. This synthetic hormone is a separately patented technology owned by Allergan. In 2008, the predecessors-in-interest to CPEX and Allergan with respect to SER-120 (Bentley Pharmaceuticals, Inc. and Serenity Pharmaceuticals Corp., respectively) entered into a license agreement (the "Allergan License") pursuant to which Allergan, ultimately, would develop and commercialize SER-120.[27] The Allergan License requires Allergan to pay CPEX royalties at a set rate and certain "milestone" lump sum payments based on the commercial sales, if any, resulting from the SER-120 venture.

Immediately before the events in question, the value of SER-120 was "difficult to ascertain" because it was in the early stages of U.S. Food & Drug Administration

---

[26]     Compl. ¶¶ 2, 9.

[27]     Huffman Trans. Aff. Ex. C (the "Allergan License"). As discussed more fully *infra*, the Allergan License is the most tangible and concrete aspect of "Serenity" insofar as Plaintiffs use that term to denote the consideration owed to them under the alleged agreement at the core of this dispute. The Allergan License, which is referenced explicitly or implicitly in the Complaint at ¶¶ 9-11, 15-17, 32, 33, 41, 63-68, 76-79, 81, and 84, is therefore appropriately part of the record before me at the motion to dismiss stage. *See Santa Fe Pac. Corp.*, 669 A.2d at 69-70.

("FDA") testing.[28]  At least once, SER-120 failed to pass the FDA's "Phase III" testing level, a key regulatory hurdle.[29]  But in the fall of 2012, well over a year after CPEX was acquired by the parties, SER-120 passed the Phase III test.  In addition, Allergan decided in February 2013 to fund a confirmatory trial of the drug.  Thus, it appeared that SER-120 had become very valuable.[30]

The Complaint describes "Serenity" as "that one particular use of" CPEX's patented CPE-215 drug delivery technology "as combined with Allergan Inc.'s (or its assignees' or successors') patented-low dose desmopressin technology for the treatment or prevention of nocturia. . . . Included in this was the then-developed combination, known as SER-120."[31]  Plaintiffs apparently intend for "Serenity" to mean more than merely the licensing or royalty rights between CPEX and Allergan related to SER-120.  The oral "Serenity Agreement," according to the Complaint, "contemplated a transfer to Cheval of an additional 60.5% interest of *all CPEX's rights in Serenity*, not a mere assignment of the Allergan License,"[32] which would have put the balance of ownership as to Serenity at approximately 80 percent to 20 percent, in favor of "Cheval."  The Complaint differentiates between "(i) the *license rights to Serenity* through a separate license agreement with CPEX and (ii) subject to Allergan's consent, *the Allergan*

---

[28]     Compl. ¶ 33.

[29]     *Id.* ¶¶ 15, 33.

[30]     *Id.* ¶ 15; *see also id.* ¶¶ 17, 33.

[31]     *Id.* ¶¶ 9-10; *see also id.* ¶¶ 43.

[32]     *Id.* ¶ 78 (emphasis added).

13

*License*, pursuant to which one potential combination, SER-120, was already being developed, through a separate assignment and assumption agreement with CPEX."[33]

Regardless of precisely how "Serenity" is defined, it is undisputed that before the Merger, all of the assets in question were owned by CPEX—*i.e.*, any relevant rights CPEX held to CPE-215, "Serenity," SER-120, and the Allergan License. If that structure were left untouched, Cheval Holdings indirectly would hold a 19.5 percent interest in those assets and Footstar an 80.5 percent interest. According to the Complaint, the Serenity Agreement called for the parties to create a new entity, FCB Serenity LLC, the equity of which would be flipped: 80 percent for "Cheval" and 20 percent for Footstar.[34] FCB Serenity would be "assigned" the Serenity assets, thus giving "Cheval" control of an additional 60.5 percent interest in those assets.[35] In the mid-December 2010 time frame, when the alleged conversations took place between Chappell and Couchman about financing the acquisition and the Serenity Agreement, they allegedly agreed that FCB Serenity would be subject to a stockholders' agreement giving protection to the minority stockholder that effectively would be a "mirror-image" of the FCB Holdings Stockholders' Agreement. Because the Serenity assets were held by CPEX, it is reasonable to infer from the allegations in the Complaint that Plaintiffs believed CPEX

---

[33]     *Id.* ¶ 63 (emphasis added); *see also id.* ¶¶ 64, 67, 76-79.

[34]     Compl. ¶¶ 59, 63, 64.

[35]     *Id.*

14

would transfer those assets to FCB Serenity at some future time, to give effect to the intended structure.

The Complaint alleges that "Cheval's receipt of an additional 60.5% interest in Serenity" was "a central precondition to Black Horse's willingness to contribute the additional [Bridge Loan] funds," and that without the extra Serenity interest, there was "no economic incentive for Black Horse" to risk $10 million in bridge financing.[36] While the Complaint's description or use of the term "Serenity" sometimes varies in relation to what Plaintiffs expected to receive, there is no question that the consideration to be provided by Plaintiffs in the oral bargain consisted of the Bridge Loan, and that alone.[37]

b.      **Written agreements concerning the Serenity Agreement**

The formation of the Serenity Agreement allegedly took place in December 2010, when the CPEX merger was being negotiated. All communications concerning the alleged Serenity Agreement were oral. The parties allegedly "did not attempt to document the Serenity Agreement prior to closing" of the merger for several reasons, including that "it would not have made sense" to do so until after CPEX was acquired and FCB Holdings thereby owned the Serenity assets.[38] That is, the parties "did not believe it was necessary or appropriate to expend the legal resources" to document the

---

[36]     *Id.* ¶ 64; *see also id.* ¶¶ 9, 56, 57.

[37]     *See* Compl. ¶¶ 3, 9, 13, 43, 56, 57, 58, 61, 62, 64, 66.

[38]     *Id.* ¶ 65.

15

Serenity Agreement until closing of the Merger was more assured and the "final implementation structure" could be determined.[39]

At least six written agreements pertaining to different aspects of the CPEX acquisition, however, were executed: the Merger Agreement, the Consulting Agreement, the Stockholders' Agreement, the Commitment Letter, the BNYM Loan, and the Bridge Loan Agreement (collectively, "the Acquisition Agreements"). The combined effect of the Acquisition Agreements is to form a network of contractual rights and obligations variously binding the entities involved in the CPEX acquisition. The Merger Agreement was signed by Couchman on behalf of FCB Holdings and FCB I Acquisition Corp., and by CPEX through its President and CEO, John Sedor. The Commitment Letter is signed by Chappell on behalf of Black Horse, Couchman on behalf of FCB Holdings and FCB I Acquisition Corp., and Sedor on behalf of CPEX. Chappell's and Couchman's signatures also appear on the Stockholders' Agreement, the Consulting Agreement, and the Bridge Loan Agreement.[40] The Merger Agreement, which incorporates by reference the Commitment Letter and the BNYM Loan, names and refers to Black Horse and Footstar as "Financing Parties" in several sections.[41] In turn, the Commitment Letter,

---

[39]     *Id.*

[40]     The entities on behalf of which Couchman and Chappell signed each agreement are as follows: for the Stockholders' Agreement: Footstar, FCB Holdings, and Cheval Holdings; for the Consulting Agreement: Footstar and Cheval Holdings; and for the Bridge Loan Agreement: Black Horse and FCB Holdings.

[41]     *See* Merger Agreement at "Recitals," §§ 3.7, 6.13, 9.6. I note also that, pursuant to § 9.3(a), any "notices or other communications" under the Merger Agreement

16

Stockholders' Agreement, Consulting Agreement, and Bridge Loan each refer to the Merger Agreement.[42]

These agreements are critical to the disposition of Defendants' motion to dismiss. Where relevant, the material terms and language from these agreements will be excerpted and discussed in the legal Analysis section, *infra*. At this point, I note only that there is no allegation that any of the written agreements pertaining to the CPEX acquisition contains the term "Serenity" or makes any reference to the "Serenity Agreement."

### c.    Parties to the alleged Serenity Agreement

The Complaint varies in its identification of the entities or persons that allegedly made promises with respect to the Serenity Agreement. Nevertheless, a few points are relatively clear. First, it was Black Horse alone that made the Bridge Loan commitment and that actually expended the $10 million to fund Plaintiffs' part of the Bridge Loan. Second, it was Couchman and Footstar, or Couchman on behalf of Footstar, that made the alleged promises on Defendants' side. Third, CPEX is not alleged to be a promisor or promisee with respect to the Serenity Agreement, although the assets in question are

---

were to be sent to FCB Holdings ("Attn: Jonathan M. Couchman") and to Black Horse ("Attn: Dale B. Chappell") with copies to designated law firms.

[42]    *See, e.g.*, Commitment Letter ¶ 1 ("This Commitment Letter shall become effective only upon the execution and delivery of the Merger Agreement by the parties thereto. . ."); *id.* ¶ 10 ("This Commitment Letter, together with the Merger Agreement, reflects the entire understanding of the parties with respect to the subject matter hereof, and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof."); *see also* Stockholders' Agreement at "Background A" ("The Company was formed for the purpose of becoming a party to [the Merger Agreement]."); Consulting Agreement 1; Bridge Loan Agreement at "Recitals," §§ 4, 6, 7, 8, 11.

CPEX's (or FCB Holdings's insofar as it owned 100 percent of CPEX's common stock post-Merger).

As to who was to receive the Serenity assets under the alleged Serenity Agreement, the Complaint is less clear. In several paragraphs, Plaintiffs identify "Cheval," defined to include both Cheval Holdings and the two Black Horse funds, as the recipient;[43] elsewhere, they suggest it was Cheval Holdings specifically;[44] and still elsewhere, Plaintiffs specify the Black Horse funds alone.[45] In some other paragraphs, the Complaint simply lumps all Defendants and all Plaintiffs together when discussing the Serenity Agreement, without regard for the separate corporate identities of the various parties.[46]

---

[43]     *Id.* ¶ 9 ("In consideration for Blackhorse providing more capital . . . . ***Cheval*** would receive . . . ."); *Id.* ¶ 15 ("[Couchman] and Footstar had agreed to grant 80% of CPEX's interest in Serenity to ***Cheval Holdings and Blackhorse*** . . . ."); *Id.* ¶ 43 ("Blackhorse, Cheval Holdings, and Defendants agreed that ***Cheval*** would receive . . . in exchange for Blackhorse taking a last minute risk of $10 million on a bridge loan."); *see also* ¶¶ 61, 64. All emphases are added in this and the succeeding three notes.

[44]     *Id.* ¶ 3 ("Couchman and Footstar . . . promis[ed] the Cheval Plaintiffs that in exchange for receiving millions of additional financing support from Blackhorse, ***Cheval Holdings*** would receive . . . .").

[45]     *Id.* ¶ 64 ("There was no economic incentive for ***Black Horse*** to risk [the Bridge Loan] unless ***it*** received additional consideration . . . ."); *Id.* ¶ 13 ("In exchange for the 80% interest in Serenity, ***Blackhorse*** provided more than $20 million in loans . . . .").

[46]     *Id.* ¶ 9 ("[T]he ***Cheval Plaintiffs*** and ***Chappell*** on the one hand and ***Footstar and Couchman*** on the other agreed that . . . ."); *Id.* ¶ 66 ("Believing ***Couchman***, ***Chappell*** funded millions of dollars of additional capital . . . .").

18

### 4. Events after the CPEX acquisition

The CPEX acquisition was consummated on or about April 4, 2011. At various points thereafter, Chappell attempted to persuade Couchman to document the Serenity Agreement, but Couchman allegedly demurred, each time with a different excuse.[47] Apparently, Couchman's reluctance was due in part to the fact that Footstar, then a publicly traded company, had "never publicly disclosed the Serenity Agreement to its shareholders."[48] The Footstar Entities underwent a restructuring in which they merged into the newly formed Xstelos Entities, and the former stockholders of Footstar, Inc., including Couchman, became stockholders of Xstelos Holdings.

In February 2012, Couchman and Xstelos proposed an asset swap transaction "to justify the transfer" of the Serenity assets from CPEX to "Cheval."[49] Pursuant to this proposal, Xstelos would acquire Cheval Holdings's 19.5 percent interest in a CPEX subsidiary that owned a New Hampshire office building valued at $1.5 million, in consideration for CPEX transferring to Plaintiffs 60.5 percent of "Serenity" plus $150,996 in cash. When Xstelos sent draft documentation for this transfer to Chappell in

---

[47] Compl. ¶¶ 69-72.

[48] *Id.* ¶ 72. In this regard, I take judicial notice of the fact during the process of creating the new Xstelos Entities, effectuating the Footstar Plan of Reorganization, registering Xstelos Holdings's shares with the SEC for listing on the OTC Bulletin Board system, and ultimately taking Xstelos Holdings private via a reverse stock split, no word of the Serenity Agreement was disclosed in public filings to the Footstar/Xstelos stockholders, even though Xstelos Holdings's registration statement and final prospectus mentions SER-120 and the Allergan License in discussing CPEX's business. *See, e.g.*, Xstelos Holdings, Inc., Prospectus (Apr. 25, 2012).

[49] *Id.* ¶¶ 72-73.

May 2012, however, Chappell balked. Plaintiffs allege that the structure contemplated by the draft agreements "was not what the parties had agreed to in the Serenity Agreement," because Xstelos's draft paperwork only purported to transfer the Allergan License, while Plaintiffs were seeking to document their ownership of a "broader license" to the Serenity assets as described in the Complaint.[50]

The parties unsuccessfully continued to discuss their differences. In June 2012, Xstelos filed a certificate of formation creating FCB Serenity LLC, a wholly owned CPEX subsidiary that was supposed to be the vehicle for effectuating the Serenity transfer. Xstelos also secured Allergan's consent to the assignment of the Allergan License from CPEX to FCB Serenity. The parties' attorneys, including Finerman, discussed a draft of the operating agreement for FCB Serenity and the contemplated asset swap transactions. Those draft agreements would have removed FCB Serenity from FCB Holdings and CPEX, and given it to Plaintiffs and Xstelos in the form of their anticipated respective 80 and 20 percent ownership interests.

In September 2012, Couchman emailed Chappell requesting Cheval Holdings's approval of a consent dividend for the 2011 CPEX income to enable Couchman to deal with a tax issue that had arisen after the Merger.[51] Chappell responded that he would consent to the dividend if "XTLS and Cheval will document the ownership rights to

---

[50]    *Id.* ¶¶ 78, 81.

[51]    Compl. ¶¶ 46-49, 88-91.

Serenity in the next five business days."[52]  When asked what that had to do with the consent dividend, Chappell answered that he was "not asking for anything new.  It is simply documenting the agreement that we have already reached almost two years ago which was to split Serenity 80/20 in favor of Cheval."[53]  Couchman replied that, "We agree in principle to split Serenity 80/20 in favor of Cheval, with the New Hampshire building to go to Xstelos, subject to reaching agreements as to mechanics of distribution, governance, escrow provisions . . . all to be finalized in definitive documentation."[54]  After further back-and-forth, Couchman ultimately stated, "if you accept a consent dividend, I will endeavor to document the Serenity transaction we have been discussing for quite some time."[55]  Cheval Holdings then approved the consent dividend.

In addition, Chappell proposed entering into a "simple term sheet outlining some basic terms of the Serenity Agreement" and provided a draft to Xstelos in late September 2012.  Xstelos attached this term sheet to the latest drafts of the operating agreement for FCB Serenity, even though, according to Plaintiffs, "Cheval had previously rejected certain of the terms of these drafts because they did not accurately reflect the Serenity

---

[52]     *Id.* ¶ 92.

[53]     *Id.* ¶¶ 93-94.

[54]     *Id.* ¶ 95.

[55]     *Id.* ¶ 100.

Agreement."[56]  This exchange of drafts and negotiations about "documenting" the "Serenity Agreement" continued from October into December 2012.[57]

The Complaint further alleges that on December 19, 2012, Couchman suddenly changed position after more than two years.  Referring to Chappell's request for a license from CPEX as well as an assignment of the Allergan License, Couchman wrote to Chappell: "Dale, you and I never discussed a license agreement.  This is something new you are asking for and we are not inclined to provide.  We thought we were discussing a transaction to sell 60% of the Serenity interest only.  We won't provide a license agreement."[58]

### 5.    Relations sour

The tax issue that prompted Xstelos to obtain Cheval Holdings's approval of a consent dividend also caused Xstelos to distribute in late 2012 all of CPEX and FCB Holdings's income through the payment of cash dividends.[59]  The Complaint alleges that "[i]n retaliation for Cheval's requests to perform the Serenity Agreement," Xstelos determined to accelerate the payment of the FCB Holdings dividends.[60]  More

---

[56]     *Id.* ¶ 103.

[57]     During the same time frame, SER-120 successfully passed FDA Phase III testing. *See supra* I.B.3.a.

[58]     *Id.* ¶ 106.

[59]     The mechanics of the personal holding company tax, the parties' initial misunderstanding of it, and their subsequent attempts to avoid paying it are not material to the pending motion to dismiss.

[60]     *Id.* ¶ 108.

specifically, Cheval Holdings wanted the dividend to be deferred for three months, until it could redomicile its ownership of FCB Holdings to Ouray, the Swiss entity owned by Cheval Holdings, and thereby reduce its tax burden. The Complaint alleges that there also would have been no cost to Xstelos to wait until after the completion of the redomiciliation, and that there was no benefit to Xstelos from paying the dividend earlier. Yet, over Chappell's objection, Couchman and Finerman (as directors of FCB Holdings) voted to declare cash dividends of $9 million in September 2012 and another $1 million in October 2012.

On June 11, 2013, Couchman recommended to Chappell that the equity holders of FCB Holdings make a pro rata equity contribution to the company, which would be followed by an immediate cash dividend of approximately the same amount. Cheval Holdings "reluctantly" agreed, because it feared being diluted if it did not participate in the equity raise.[61] The Complaint alleges that, through these actions, Couchman sought to inflict economic harm on Cheval Holdings, because it was paying tax on the dividends while Xstelos was not. Defendants allegedly threatened the issuance of dividends "solely as a mechanism to threaten Cheval and to cause Cheval to walk away from the Serenity Agreement and to otherwise exert economic pressure on Cheval."[62]

Plaintiffs also complain that Xstelos has harmed them by breaching the Stockholders' Agreement and the Consulting Agreement. The Stockholders' Agreement,

---

[61]     *Id.* ¶ 119.

[62]     *Id.* ¶ 121.

to which Footstar, Cheval Holdings, and FCB Holdings are parties, was to govern the parties' post-Merger relationship and protect Cheval Holdings's interest in CPEX. As a 19.5 percent owner, Cheval Holdings otherwise would have been at the mercy of Footstar and Xstelos in this regard. In terms of the Stockholders' Agreement, Plaintiffs allege the following litany of breaches: Xstelos violated Section 2.2(a) by entering into related party transactions without Cheval Holdings's consent; it violated Section 2.6 by failing to timely present annual budgets for CPEX and FCB Holdings; it violated Section 2.2(c) by causing FCB Holdings and its subsidiaries to make capital expenditures exceeding $100,000 without Cheval Holdings's consent; and it violated Section 5.4(c) by failing to provide management, personnel, and administrative services to CPEX at Xstelos's expense.

The Consulting Agreement required Footstar to pay Cheval Holdings a consulting fee "relating to the performance of services on CPEX's patent technologies and their use, application, monetization and relicensing, to the extent funds are available . . . ."[63] An attached schedule provided for payments of consulting fees of $1 million, $750,000, $750,000, and $500,000 for the years 2011, 2012, 2013, and 2014, respectively. Thereafter, an annual consulting fee of $250,000 would be owed to Cheval Holdings until the arrangement was terminated.[64] The Complaint alleges that Cheval Holdings has

---

[63] Consulting Agreement 1.

[64] *Id.* at 3.

performed all of its obligations under the Agreement, but that it currently is due $2,062,500 in fees.

## C.    Procedural History

Plaintiffs filed this action on June 13, 2013. After Defendants moved to dismiss, Plaintiffs amended the Complaint on October 29, 2013.[65] The Complaint as amended asserts causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, and unjust enrichment. In particular, Plaintiffs accuse Xstelos and Couchman of breach of the alleged Serenity Agreement, and, by way of relief, seek monetary damages (Count I) or specific performance (Count II). In Counts VI – VIII, Plaintiffs assert alternative causes of action against Xstelos and Couchman relating to the Serenity Agreement for fraudulent inducement, promissory estoppel, and unjust enrichment. Count III consists of a claim against Xstelos for breach of the Consulting Agreement. In addition, Plaintiffs assert claims against Xstelos and FCB Holdings for breaches of the Stockholders' Agreement (Count IV) and the implied covenant of good faith and fair dealing associated with the Stockholders' Agreement (Count V).

Defendants again moved to dismiss the Complaint in its entirety on November 18, 2013. After full briefing, I heard oral argument on that motion on February 10, 2014. This Memorandum Opinion constitutes my ruling on the motion. In the analysis below, I

---

[65]    Plaintiffs filed a corrected version of the Amended Verified Complaint on November 1, 2013. This corrected Amended Verified Complaint is the operative "Complaint" for purposes of this Memorandum Opinion.

address first the claims that concern the Serenity Agreement (Counts I, II, VI, VII, and VIII), then Count III relating to the Consulting Agreement, and finally Counts IV and V, which arise from the Stockholders' Agreement.

## D. Parties' Contentions

Defendants seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. With regard to the Serenity Agreement, Defendants contend that, even accepting all of the Complaint's allegations as true, the breach of contract counts fail for two reasons. First, the oral promise at the core of the alleged agreement is too vague to be enforceable, because the alleged facts do not manifest a mutual assent between the parties as to the essential terms, including what was to be transferred under the agreement, how, and to whom. Second, Defendants argue that even if there were an enforceable oral promise concerning Serenity, it would conflict with the terms of the subsequent written agreements. Because those agreements are completely integrated, Defendants contend, the parol evidence rule operates as a complete bar to Plaintiffs' claims for breach of the Serenity Agreement. Defendants further assert that Plaintiffs' alternative theories of liability arising from the alleged Serenity Agreement—fraud, promissory estoppel, and unjust enrichment—also fail because the subsequent written agreements render it impossible for Plaintiffs to have "reasonably relied" on any prior oral promises or agreements. They assert further that the fraudulent inducement claim is defective for the separate reason that the alleged promises are statements of future intent rather than misrepresentations of present fact.

Plaintiffs respond that the Complaint alleges a simple, clear, oral contract and that Delaware law allows for such agreements to be enforceable even where the parties leave the act of documenting the terms for a later time. In that regard, Plaintiffs argue that the Complaint consistently described the Serenity Agreement, and uniformly identified the assets to be transferred, the core economic terms, and the parties to the Agreement. Plaintiffs counter Defendants' parol evidence rule argument on two fronts. First, they assert that, even if fully integrated, none of the subsequent written agreements bind *all* of the alleged parties to the Serenity Agreement, thereby rendering that Agreement enforceable by either Cheval Holdings or Black Horse, if not both. Second, Plaintiffs contend that because the fraudulent inducement claim is well-pled, the fraud exception to the parol evidence rule applies here in any event. As to the promissory estoppel and unjust enrichment claims, Plaintiffs aver that they were brought as alternatives to the Serenity breach of contract claim, and that they are well-pled and supported by the factual allegations in the Complaint.

With respect to Plaintiffs' claim for the unpaid consulting fees under the Consulting Agreement, Defendants assert that claim is moot, because 100 percent of the outstanding amount was funded into an escrow account for the benefit of Cheval Holdings on September 6, 2013. Plaintiffs, however, deny that the fees were paid in accordance with the Agreement, and dismiss Defendants' mootness argument, in any event, as being based on facts not contained in the Complaint.

Lastly, Defendants move to dismiss the claim for breach of the Stockholders' Agreement based on Plaintiffs' failure to plead cognizable damages, and on mootness

27

grounds. Defendants also maintain that the implied covenant of good faith and fair dealing claim fails because the contract is not silent on the issue of FCB Holdings's ability to pay dividends, and therefore limits Plaintiffs' rights in that regard. They argue further that there is no basis for an allegation of bad faith where, as here, Defendants acted in accordance with the applicable contract provision.

In response, Plaintiffs emphasize that the Complaint identifies the provisions of the Stockholders' Agreement and the actions of Defendants that constitute the alleged breaches. Further, they deny that their breach of contract claim is moot, or that the damages allegations are deficient. On the implied covenant issue, Plaintiffs counter that the allegations in the Complaint support an inference of bad faith under Delaware law, because Defendants accelerated the dividends in a deliberate effort to harm Cheval Holdings, and thereby abused the discretion afforded them by the contract.

## II. ANALYSIS

### A. Standard for dismissal under Rule 12(b)(6)

The governing pleading standard in Delaware to survive a motion to dismiss is reasonable conceivability.[66] The Court's inquiry in this regard is to determine "whether [Plaintiffs'] well-pleaded Complaint stated a claim that is provable under any reasonably conceivable set of circumstances."[67] In so doing, the Court must

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-

---

[66] *Cent. Mort. Co. v. Morgan Stanley Mort. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[67] *Id.* at 538.

> pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[68]

The court, however, need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[69] Failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[70]

## B.      Counts I and II

Defendants move to dismiss Counts I and II, which assert breach of the alleged Serenity Agreement, arguing that the Complaint fails adequately to plead the elements of an enforceable contract. They also contend that, taking Plaintiffs' allegations as true, the Serenity Agreement necessarily would conflict with the terms of the multiple written agreements that the parties executed shortly after the alleged Serenity promise was made. After considering the parties' extensive briefing and arguments, I conclude that, based on the allegations in the Complaint, it is not reasonably conceivable that the Serenity Agreement is an enforceable contract between the parties. I also am convinced, therefore, that it is not reasonably conceivable that Plaintiffs could show that the specific performance remedy sought in Count II would be appropriate.

---

[68]    *Id.* at 535 (citing *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del. 2002)).

[69]    *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[70]    *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

**1.     The Complaint does not support a reasonable inference that an enforceable contract existed with respect to the Serenity Agreement.**

A "valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[71]   Under Delaware law, "overt manifestation of assent—not subjective intent—controls the formation of a contract."[72]   Whether both of the parties manifested an intent to be bound "is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."[73]   The Court's determination "must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives that the parties are attempting to attain."[74]   To determine whether a binding contract exists, therefore, courts in Delaware look for "objective, contemporaneous evidence indicat[ing] that the parties have reached an agreement," whether that be in the parties' spoken words or writings.[75]

### a.     Intent to be bound

Applying these principles at the motion to dismiss stage, I first look to the factual allegations of the Complaint to determine whether Plaintiffs could prove under any

---

[71]     *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *see also Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

[72]     *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971).

[73]     *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986).

[74]     *Id.*

[75]     *Id.*

30

reasonably conceivable set of facts that the parties made objective manifestations of an intent to be bound by the alleged Serenity Agreement. Taking all well-pled facts alleged as true, and drawing all reasonable inferences in Plaintiffs' favor, as I must, I nevertheless conclude that it is not reasonably conceivable that Plaintiffs could prove that the parties shared an intent to be bound by the Serenity Agreement.

Counts I and II of the Complaint allege the following:

> Pursuant to the Serenity Agreement, the Cheval Plaintiffs agreed to provide $10,000,000 ($7,465,000 more than its pro rata amount) towards the bridge loans in exchange for the Xstelos Entities' and Couchman's express agreement to effectuate the transfer of an additional 60.5% of Serenity to the Cheval Plaintiffs following consummation of the merger resulting in a total ownership of 80%. The Xstelos Entities and Couchman promised the Cheval Plaintiffs that they would memorialize the agreement shortly after consummation of the CPEX transaction.[76]

So, according to Plaintiffs, the quid pro quo of the Serenity Agreement is that: (1) the Cheval Plaintiffs—defined by them to include Cheval Holdings and both Black Horse funds—would make the $10 million Bridge Loan; and (2) in return, Xstelos and Couchman would effectuate a transfer of a 60.5% interest in "Serenity" to the Cheval Plaintiffs following the consummation of the CPEX merger.[77]

---

[76] Compl. ¶¶ 135-36, 142-43.

[77] This Section focuses narrowly on the parties' intent to be bound by the Serenity Agreement. The parties vigorously dispute the parameters of the Serenity Agreement in terms of what precisely "Serenity" is or who precisely was supposed to give and receive "Serenity" under the alleged Agreement. Those issues are discussed *infra* in Section II.B.1.b.

31

As recited *supra*, the alleged Serenity Agreement was reached during a phone call "in or about December 2010," a time period during which Chappell and Couchman spoke by telephone multiple times each business day regarding the CPEX merger.[78] On January 3, 2011, the parties executed at least five sophisticated legal agreements to accomplish the CPEX acquisition: the Merger Agreement, the Commitment Letter, the Consulting Agreement, the Stockholders' Agreement, and the BNYM Loan. Taking the terms of the Serenity Agreement as alleged in the Complaint, it is not reasonably conceivable that Plaintiffs could prove under Delaware law that the parties intended to be bound by the Serenity Agreement, in light of their execution only days or weeks later of these written agreements.

The Complaint avers that Plaintiffs' side of the alleged Serenity bargain was that "the Cheval Plaintiffs" would "provide $10,000,000 ($7,465,000 more than its pro rata amount) towards the bridge loans."[79] Indeed, the Serenity transfer is alleged to have been "a central precondition" to Plaintiffs' making the $10 million Bridge Loan and rescuing the CPEX deal.[80] Section 3.7 of the Merger Agreement, entitled "Financing," states that the Merger financing "will consist of an aggregate of not less than $80,000,000 of financing, comprised of $16,000,000 of financing from the FB Financing Parties [defined as Footstar and the Black Horse funds] (of which $3,000,000 has already been funded

---

[78]     Compl. ¶ 57.

[79]     Compl. ¶¶ 135-36, 142-43.

[80]     *Id.* ¶ 64.

into Merger Sub and NewCo and $13,000,000 of which is committed pursuant to the FB Commitment Letters). . . ."[81] Section 3.7 further states that the FB Commitment Letters together with the BNYM Loan "shall, collectively, be referred to as the 'Financing Agreements,'" and that, "There are no conditions precedent or contingencies related to the funding of the full amount of the Financing, other than as expressly set forth in the Financing Agreements, and there are no side letters or other contracts or arrangements related to the Financing other than the Financing Agreements."[82]

The Complaint makes clear that Plaintiffs considered the Serenity Agreement a "central precondition" to their willingness to put up the $10 million, and that the $10 million Bridge Loan was the only consideration on Plaintiffs' side of the Serenity bargain. Given these allegations, the only reasonable inference from the language of Section 3.7 of the Merger Agreement is that the Serenity Agreement would have been set forth or at least referenced specifically in the "Financing Agreements"—*i.e.*, in the Commitment Letter. But, the Commitment Letter, which was signed on the same day as the Merger Agreement by Chappell on behalf of the Black Horse funds and Couchman on behalf of FCB Holdings, makes no reference to the Serenity Agreement.

In the Commitment Letter, Chappell and Black Horse agreed that, "Subject to Paragraph 2 hereof, the Sponsor [Black Horse] hereby commits to provide, or cause an assignee permitted by Paragraph 4 of this Commitment Letter to provide, a loan ("the

---

[81]    Merger Agreement § 3.7.

[82]    *Id.*

33

Loan") to Buyer [FCB Holdings]" in the amount of $10 million. "The Loan," it continues, "shall generally be on the terms set forth in Exhibit A attached hereto." Paragraph 2 of the Commitment Letter states conditions "subject to" which Black Horse was committing the Loan. Plaintiffs do not contend, however, that anything in the Commitment Letter, Paragraph 2, or Exhibit A thereto made reference to the Serenity Agreement, either by name or in substance.

The "Summary of Terms" attached as Exhibit A to the Commitment Letter is just over two pages long. It refers to terms such as the borrower and lender, the loan amount, closing date, interest rate, maturity, repayment and security terms, events of default, covenants, and a three-percent loan fee. Plaintiffs do not assert, nor could they, that Serenity is mentioned anywhere in this term sheet. Chappell and Couchman, on behalf of Black Horse and FCB Holdings, explicitly agreed, however, that, "This Commitment Letter, together with the Merger Agreement, reflects the entire understanding of the parties with respect to the subject matter hereof and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof."[83]

According to the attached Summary of Terms, the "Purpose" of the Commitment Letter, as described in the Letter itself, was to reflect Black Horse's commitment to loan $10 million in bridge financing to FCB Holdings. The $10 million Bridge Loan is the reason the Commitment Letter exists; it, and it alone, is the "subject matter" of the Letter. The only reasonable inference from the Commitment Letter is that there was no other

---

[83] Commitment Letter ¶ 10.

"understanding of the parties" with respect to the $10 million Bridge Loan. I conclude, therefore, that is not reasonably conceivable that Chappell and Couchman could have signed the Commitment Letter while also intending to manifest assent to another, undisclosed, side agreement concerning the Bridge Loan.[84]

This conclusion is buttressed by the plain language of the other Acquisition Agreements as well. According to the Complaint, the consideration to be provided by Defendants' side of the alleged Serenity bargain was that the Xstelos Entities and Couchman would "effectuate the transfer of an additional 60.5% of Serenity to the Cheval Plaintiffs following consummation of the merger resulting in a total ownership of 80%."[85] The Complaint also alleges that all parties understood that, post-closing, CPEX and all of its assets would be held 100 percent by FCB Holdings, which in turn was held 80.5 percent and 19.5 percent, respectively, by Footstar and Cheval Holdings. The parties carefully designed this structure to accomplish their tax avoidance goals. The only reasonable inference, therefore, is that at some time after closing, the Serenity assets would have to be transferred from FCB Holdings to one or more of the Cheval Plaintiffs.

---

[84] I also note in this regard that the actual Bridge Loan Agreement, signed by Chappell for Black Horse and Couchman for FCB Holdings at the April 5, 2011 closing of the CPEX Merger, is similarly devoid of any reference to "Serenity" or the alleged Serenity Agreement. As with the Commitment Letter, the parties to the Bridge Loan Agreement agreed that: "This Agreement, including the exhibits attached thereto, constitutes the entire agreement of the parties relative to the subject matter hereof and supersedes any and all other agreements or understandings, whether written or oral, relative to the matters discussed herein." Bridge Loan Agreement § 11(b).

[85] Compl. ¶¶ 135-36, 142-43.

Here again, the plain language of the parties' January 3, 2011 agreements is in conflict. According to the Stockholders' Agreement, Footstar and Cheval Holdings "deem[ed] it to be in their best interests to provide for certain provisions governing [1] the control and operation of [FCB Holdings] . . . [2] restrictions on the transfer of the Shares [of FCB Holdings] and [3] for various other matters as set forth herein."[86] Article II of the Stockholders' Agreement, addressing Corporate Governance, includes a number of Negative Covenants in which the parties agreed, among other things, that FCB Holdings would not enter into any "declaration or payment of any dividends or distributions that are not paid pro rata to [FCB Holdings'] stockholders."[87] To the extent the parties were planning to distribute Serenity assets, or the stock of a new subsidiary created to hold the Serenity assets, as Plaintiffs allege, such a distribution would not have been pro rata according to Footstar's and Cheval Holdings's 80.5 percent and 19.5 percent respective ownership of FCB Holdings.

Moreover, in Article V of the Stockholders' Agreement, in which the parties addressed several "Miscellaneous" issues, the parties agreed that "Footstar and Cheval [Holdings] shall in good faith negotiate, execute and deliver a tax sharing agreement on or prior to the closing of the Merger."[88] They also agreed that, "As the parent of the Group, Footstar, Inc. agrees that it shall, and shall cause the subsidiaries in the Group to,

---

[86]     Stockholders' Agreement, Background ¶ E.

[87]     *Id.* § 2.2(o).

[88]     *Id.* § 5.2.

use commercially reasonable efforts to preserve and maximize the utilization of the [NOLs] for the benefit of the Group. . . ."[89] Notably, in the case of both of these issues, the Stockholders' Agreement reflects the parties' shared intent to execute a tax-sharing agreement, and to hold Footstar to its promise that it would make proper use of the NOLs in the future. Thus, if a dispute were to arise with respect to either of those topics, this Court or any court would have contemporaneous evidence that an agreement existed, and perhaps would entertain extrinsic evidence, if necessary, to determine whether and how to enforce the terms of the parties' agreements.

Identifying such ancillary agreements, if only in a summary manner, was presumably necessary because the parties further agreed that, "This [Stockholders'] Agreement constitutes the entire agreement among the parties hereto in respect of the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties in respect of the subject matter hereof." Again, as stated in the recitals, the subject matter and purpose of the Stockholders' Agreement was for Footstar and Cheval Holdings to provide for the future "control and operation of" FCB Holdings and its subsidiaries. To my mind, it is not reasonably conceivable that the parties could have executed such an agreement detailing the future control and operation of FCB Holdings while also intending to be bound by an ill-defined, prior oral agreement that would require FCB Holdings to effectuate the transfer of valuable corporate assets to Cheval Holdings or Plaintiffs generally. As demonstrated by the Stockholders'

---

[89] *Id.* § 5.3. "Group" is a term defined there as meaning the Xstelos Entities and FCB Holdings.

Agreement itself, the parties knew how to manifest their shared intent to "in good faith negotiate, execute and deliver a tax sharing agreement," and to "use commercially reasonable efforts to preserve and maximize" the NOLs for their mutual benefit. It is unreasonable to infer, therefore, that the parties had a shared intention to transfer the Serenity assets away from FCB Holdings on a non-pro rata basis at a later date for no additional consideration, when there is no mention of any such agreement or understanding in the Stockholders' Agreement or any of the other Acquisition Agreements.

In arguing for a contrary conclusion, Plaintiffs rely heavily on *PharmAthene, Inc. v. SIGA Technologies, Inc.*[90] In that case, SIGA Technologies negotiated with PharmAthene to collaborate in the development of an unproven drug technology ("SIGA-246") owned by SIGA. The parties first discussed a licensing agreement and memorialized their agreement to collaborate in a two-page document referred to as a "License Agreement Term Sheet" or "LATS," which described the parties' objective in the collaboration and laid out a framework of economic terms relating to patent matters, licenses, license fees, and royalties. The LATS itself bore a legend that said "Non Binding Terms." The parties later explored a possible merger and entered into a merger agreement and a bridge loan agreement in which they undertook, if the merger did not go

---

[90] *PharmAthene, Inc. v. SIGA Techs., Inc. (PharmAthene I)*, 2008 WL 151855 (Del. Ch. Jan. 16, 2008), *aff'd in part, rev'd in part*, 67 A.3d 330, 346 (Del. 2013). As noted in the Supreme Court's opinion in *Pharmathene*, this Court issued at least six separate opinions or orders in that case. In the interest of brevity, I use the same short form names (*PharmAthene I-VI*) for those opinions as the Supreme Court did. 67 A.3d at 340-41 nn.21-26.

forward, to negotiate in good faith a license agreement to SIGA-246 in accordance with the LATS.

PharmAthene expended funds and provided information and technological support to SIGA in connection with the continued development of SIGA-246. Less than three months after the LATS was created, SIGA and PharmAthene signed a Letter of Intent to merge the companies, and attached a "Merger Term Sheet." The Merger Term Sheet laid out terms for tax treatment, consideration, and financing. It also stated that the parties agreed to negotiate in good faith the terms of a definitive License Agreement for SIGA-246, "in accordance with the terms set forth in the [LATS],"[91] if the merger did not take place.

Several weeks later, the parties entered into a Bridge Loan Agreement whereby PharmAthene loaned $3 million to SIGA for expenses related to the Merger, the continued development of SIGA-246, and overhead. The Bridge Loan Agreement provided that, upon termination of the Merger Term Sheet or a failure to execute a definitive Merger Agreement, the parties "will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet."[92] Shortly thereafter, a Merger Agreement was executed, in which the parties agreed that, "Upon any termination of this Agreement, SIGA and Pharmathene will negotiate in good faith with the intention of executing a

---

[91] *PharmAthene I*, 2008 WL 151855, at *10.

[92] *Id.*

39

definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet."[93] The LATS was attached as an exhibit to the Merger Agreement, as it was with the Bridge Loan Agreement.

By the time the merger was supposed to close, SIGA-246 achieved some success related to its clinical testing, and its value, previously uncertain, now had a greater prospect of being very large. Ultimately, the Merger did not close, and the parties' subsequent discussions failed to produce a license agreement. PharmAthene sued for breach of contract and for non-contractual relief, arguing that the LATS evidenced a binding agreement by SIGA to enter into a license agreement for SIGA-246 according to its terms.

In deciding SIGA's motion to dismiss, this Court observed that: "Neither the LATS alone nor the LATS together with PharmAthene's partial performance are likely to be sufficient to show the parties intended to be bound by the LATS as an agreement to agree."[94] Based on the subsequent written agreements signed by the parties, however, the Court concluded that PharmAthene "conceivably could adduce facts that support the allegations in its Complaint that the parties intended to bind themselves to enter into a license agreement consistent with the LATS."[95] The Court found "the cumulative effect of the LATS, the Bridge Loan Agreement, the Merger Agreement, and the parties'

---

[93] *Id.* at *11.

[94] *Id.* at *9.

[95] *Id.* at *12.

conduct"[96] made it reasonably conceivable the parties had an enforceable agreement that they would enter into a contract in accordance with the material terms of the LATS, and that those material terms were sufficiently well-pled to withstand a motion to dismiss under Delaware law.[97]

The Cheval Plaintiffs argue that their allegations are "virtually identical" to those alleged by the plaintiff in *PharmAthene*.[98] I note initially that, even if this were true, it would not support Plaintiffs' argument that the Serenity Agreement, in itself, was a fully developed and enforceable contract. An important premise of Plaintiffs' argument is that the oral Serenity Agreement is analogous to the LATS in the *PharmAthene* case, and that, as this Court in *PharmAthene* found it reasonably conceivable that the parties there intended to be bound by the LATS, so should it find here with respect to the Serenity Agreement. This Court noted at the motion to dismiss stage in *PharmAthene*, however, that "Not even PharmAthene contends the unsigned LATS alone, with the 'Non Binding Terms' legend, creates an enforceable contract."[99] As this Court indicated in *PharmAthene*, had the plaintiff relied on the LATS alone, or the LATS in combination

---

[96] *Id.* at *9.

[97] In reviewing this Court's post-trial Opinion, *PharmAthene III*, 2011 WL 4390726 (Del. Ch. Sept. 22, 2011), the Delaware Supreme Court held that, "the record supports the Vice Chancellor's factual conclusion that 'incorporation of the LATS into the Bridge Loan and Merger Agreements reflects an intent on the part of both parties to negotiate toward a license agreement with economic terms substantially similar to the terms of the LATS if the merger was not consummated.'" *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (Del. 2013).

[98] Pls.' Answering Br. ("PAB") 5.

[99] *PharmAthene I*, 2008 WL 151855, at *9.

41

with the parties' alleged partial performance, its claim likely would not have survived a motion to dismiss.[100] For *PharmAthene* to support Plaintiffs' argument that it is reasonably conceivable that the oral Serenity Agreement *alone* created an enforceable contract, that case would have to be read as finding that it was reasonably conceivable that the LATS *alone* conceivably could have constituted an enforceable contract between PharmAthene and SIGA. None of the Court's rulings in *PharmAthene* support that proposition.[101]

Whether or not *PharmAthene* stands for the legal propositions Plaintiffs suggest it does, the dispositive facts in that case are simply not present here. Where the plaintiff in *PharmAthene* pointed to the written LATS document as evidence of an agreement as to certain material terms, Plaintiffs here point to no contemporaneous memorialization of the alleged Serenity Agreement. More problematic for Plaintiffs, however, is the fact that the subsequent written agreements in *PharmAthene* explicitly referenced, reaffirmed, and incorporated the LATS—not just once, but three times. That fact was highly material to

---

[100] *See id.*

[101] *See id.*; *see also PharmAthene II*, 2010 WL 4813553, at \*7 (stating that for purposes of the defendant's summary judgment motion, "I assume the parties intended the LATS to be binding," and proceeding to analyze the main question of "whether the alleged agreement nonetheless is unenforceable because it lacks essential terms"); *and PharmAthene III*, 2011 WL 4390726, at \*15 (concluding in post-trial opinion that the plaintiff PharmAthene "either has conceded that the LATS standing alone is nonbinding or has failed to prove by even a preponderance of the evidence that when the parties negotiated the LATS in January 2006 they intended it to constitute a binding license agreement").

the Court's denial of the motion to dismiss in *PharmAthene*. In contrast, the subsequent written agreements executed by the parties in this case do not contain a single word upon which Plaintiffs could base a reasonably conceivable claim that a collateral oral agreement existed with respect to either the Bridge Loan or FCB Holdings's assets post-merger. Indeed, taking as true Plaintiffs' factual allegations as to what the Serenity Agreement required each party to do, the alleged terms of the Serenity Agreement would conflict directly with the plain language of the Acquisition Agreements.

Delaware adheres to the objective theory of contract law precisely because of situations like this one. This Court cannot know what was in the minds of the parties three years ago when the Serenity Agreement allegedly came into being. The relevant inquiry, however, is not what the parties' subjective intent was then or is currently. This Court, and all Delaware courts, look to the parties' outward manifestations of intent and construe them according to the meaning they would have in the eyes of a reasonable person in like circumstances—*i.e.*, their objective meaning.[102] The parties in *PharmAthene* documented the principal terms of their agreement in the LATS and then reaffirmed and re-incorporated those terms in their subsequent written agreements. Thus, an important reason why it was reasonably conceivable at the motion to dismiss stage that PharmAthene might be able to prove a breach of contract claim was that the parties'

---

[102] *See Osborn*, 991 A.2d at 1159 ("Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.").

contemporaneous words and writings objectively evidenced a shared intent to be bound.[103]

The facts alleged in the Complaint here indicate that Plaintiffs subjectively believed in December 2010, and believe still, that they were promised an asset or set of assets then owned by CPEX and now owned by FCB Holdings. The facts as alleged, however, do not support a reasonable inference of an objective manifestation of the parties' shared intent to be bound by the Serenity Agreement at the time of its alleged formation. Indeed, the behavior of the parties in the days and weeks surrounding the alleged oral Serenity Agreement undermines the possibility that the Court could find it reasonably conceivable that they had such a shared intent. Further, the Complaint's non-conclusory factual allegations concerning the parties' actions *after* the time of the Serenity Agreement's formation do not support a reasonable inference that the parties intended to be bound, either. As recited *supra*, from February 2012 until December 2012, the parties had discussions about and drafted documents for a transaction in which certain CPEX real estate would be given to Xstelos and "Serenity" assets would be given to Plaintiffs. As discussed more fully in the next section, the parties failed to reach agreement in 2012 as to the meaning of certain essential terms, like "Serenity." Such ultimately fruitless negotiations, beginning in earnest a year after the CPEX Merger and well over a year after the December 2010 Serenity Agreement, cannot support a

---

[103]     *See PharmAthene I,* 2008 WL 151855, at *9.

44

reasonable inference of an intent to be bound by that oral agreement in the face of the contemporaneous evidence to the contrary in the form of the Acquisition Agreements.

Plaintiffs attempt to escape the plain language of the Acquisition Agreements by arguing that none of the integration clauses "binds *all* of the parties to the Serenity Agreement."[104] In particular, they assert that, as alleged, the Serenity Agreement is a contract among Xstelos, Couchman, Cheval Holdings, and both Black Horse Funds. Thus, Plaintiffs contend, even if Black Horse is bound by the integration clauses in the Commitment Letter and the Bridge Loan Agreement, Cheval Holdings is not; and while Cheval Holdings may be bound by the integration clause in the Stockholders' Agreement, Black Horse is not.

Plaintiffs' argument is unpersuasive from at least two perspectives. On the one hand, artfully pleading the entities and persons to the Serenity Agreement so that either Black Horse or Cheval Holdings will be able to avoid the integration clauses of the Acquisition Agreements ignores the rule that "related contemporaneous documents should be read together."[105] The wisdom of that rule carries particular force where, as here, the multiple written agreements make reference to and incorporate one another in

---

[104] PAB 20-23 (emphasis added).

[105] *Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010) (citing *Crown Books Corp. v. Bookstop Inc.,* 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990); 17A C.J.S. *Contracts* § 315, at 337 (1999); 11 Richard A. Lord, WILLISTON ON CONTRACTS § 30:26, at 239-42 (4th ed. 1999); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981)).

various ways, accomplish different aspects of the same takeover transaction, and are signed by the same two persons, even if on behalf of various separate entities.[106]

On the other hand, accepting Plaintiff's erroneous premise only creates a different, fatal problem for their breach of contract claim: if the parties to the Serenity Agreement are sufficiently amorphous to evade the integrated Acquisition Agreements, that fact would render the Serenity Agreement itself too indefinite to enforce. As noted previously, the allegations about which parties are alleged to have rights under the Serenity Agreement are different in various paragraphs of the Complaint. By identifying the promisee under the Serenity Agreement as "Cheval," which the Complaint defines as including three separate entities, Cheval Holdings and the two Black Horse funds, Plaintiffs may have sought to avoid the combined effect of the Commitment Letter, the Bridge Loan Agreement, and the Stockholders' Agreement. But accepting that definition would place this Court in the untenable position of having to choose which entity or entities should receive the remedy (be it specific performance or monetary damages) for breach of the Serenity Agreement, if that Agreement is to be enforced. Delaware courts "will not supply essential terms to the contract,"[107] and in this case, I conclude that Plaintiffs' argument regarding the parties of the Serenity Agreement would require the Court to do just that, or, alternatively, to accept a tortured construction of the Acquisition Agreements. I decline to do either.

---

[106]   *See supra* Section I.B.3.b.

[107]   *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *8 (Del. Ch. May 13, 2005).

46

For the foregoing reasons, I conclude that it is not reasonably conceivable that the parties intended to be bound by the Serenity Agreement as alleged. I therefore dismiss Counts I and II of the Complaint.

### b. Material terms of the alleged contract

As previously stated, one requirement to prove the existence of a contract is to demonstrate that the terms of the contract are sufficiently definite.[108] Plaintiffs failed to show that, based on the allegations in the Complaint and the reasonable inferences drawn from them, they conceivably could meet that requirement. Specifically, I find, as a separate and independent basis for dismissing Counts I and II, that the Complaint does not contain sufficient factual allegations to support a reasonable inference that the parties reached an agreement as to the meaning of "Serenity" insofar as that term is used to denote the asset(s) to be transferred under the Serenity Agreement.

Defendants argue that the Complaint never squarely defines "Serenity," assigning it different meanings in different paragraphs, and that Plaintiffs therefore have not alleged that there was an agreement as to this material term of the alleged contract. Plaintiffs counter that Serenity is identified as "an interest in one particular use of CPEX technology: CPEX's patented CPE-215 drug delivery technology as combined with Allergan Inc.'s (or its assignees' or successors') patented low-dose desmopressin technology for the treatment of nocturia, a urological disorder characterized by frequent nighttime urination, and other related conditions."[109] Plaintiffs asserted in both the

---

[108] *Osborn*, 991 A.2d at 1158; *see also Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

47

Complaint and their arguments that this interest "included the then-developed combination, known as SER-120,[110] but is "not limited to SER-120."[111]

Elsewhere, the Complaint describes Serenity as being more than "merely" the royalty rights owed to CPEX under the Allergan License. Rather, Plaintiffs contend that the parties understood Serenity to include a "separate license" that would be created in order to give Plaintiffs whatever residual proprietary interest CPEX held with respect to CPE-215 (as used with desmopressin) that enabled CPEX to enter into the Allergan License in the first instance.[112] Setting aside that a necessary predicate to the existence of SER-120 is the ability to use low-dose desmopressin, which is separately patented and owned by Allergan, Plaintiffs appear to allege that if SER-120 and the Allergan License somehow ceased to exist, "Serenity" as an asset or bundle of rights still would exist and would confer upon its owner the rights to use the CPE-215 delivery technology, in conjunction with desmopressin, for the treatment of nocturia and related disorders.[113]

---

[109] PAB 12 (quoting Compl. ¶ 9).

[110] *Id.* (quoting Compl. ¶ 10).

[111] *Id.* at 15 (citing Compl. ¶¶ 57-59).

[112] *See* Compl. ¶¶ 64, 76-81; *see also id.* ¶ 63 (alleging that the Serenity Agreement contemplated a transfer of "(i) the license rights to Serenity through a separate license agreement with CPEX and (ii) subject to Allergan's consent, the Allergan License . . . .").

[113] Those elements (*CPE-215*, used with *desmopressin*, for the treatment of *nocturia*) seem to be necessary to the definition of "Serenity" as Plaintiffs have pled it. *See* Arg. Tr. 62-70.

Although Plaintiffs clarified their position somewhat in their briefing and at argument, the Complaint still fails to allege facts from which a fact-finder reasonably could infer the existence of a shared understanding of the parties as to the meaning of "Serenity" sufficient to support an enforceable contract under Delaware law. I reach this conclusion for two reasons. First, Plaintiffs' own articulation of what constitutes "Serenity" lacks internal coherence. And second, setting the internal incoherence aside, it is highly questionable whether Plaintiffs' definition of the term can be squared with the reality of CPEX's limited rights under the Allergan License with respect to SER-120 and any related drug technology.

Plaintiffs' own descriptions of "Serenity" vary throughout the Complaint in ways that make it inconceivable for this Court to find that the term is sufficiently definite to be enforceable. In some paragraphs, Plaintiffs seem to equate Serenity with SER-120.[114] As discussed above, however, Plaintiffs *also* allege that they and Defendants understood "Serenity" to be something more than just SER-120 or the rights CPEX has pursuant to the Allergan License. Plaintiffs suggest that "Serenity" is something more than CPEX's rights under the Allergan License to receive royalty payments as to SER-120, but they have not alleged exactly what more it is. As Plaintiffs claim to have understood it,

---

[114] *See, e.g.*, PAB 16 (quoting Compl. ¶ 66) ("Each time he was asked, Couchman reaffirmed that he would stand by the agreement and that the parties would work out the specific governance and control provisions over SER-120 by using a mirror image of the terms set forth in the contemplated FCB Holdings Stockholders' Agreement.")

49

"Serenity" may require an entire set of new licensing agreements as between Allergan, CPEX, and Plaintiffs. The Complaint alleges, for example, that:

> Xstelos acknowledged the need for a separate license solely for the limited purpose of performing under the Allergan License while Cheval was seeking to document the previously agreed to broader license that encompassed CPEX's patented drug delivery system combined with Allergan's patented low-dose desmopressin technology for the treatment of nocturia and other related conditions.[115]

Plaintiffs attempt to downplay the differences between a "mere" assignment of the Allergan License or the right to royalties under that License on the one hand and the "broader license" they claim to have been promised on the other. But this is a gap they cannot conceivably bridge by way of some ill-defined communications in December 2010, given the complicated nature of these types of licensing agreements.

These differing descriptions point to a vagueness that this Court or any court would be ill-equipped to resolve. In this regard, the LATS in the *PharmAthene* case provides a helpful contrast. At the motion to dismiss stage, this Court ruled that the LATS conceivably could contain all the material and essential terms of the license agreement contemplated by the parties.[116] This conclusion was based on the fact that the two-page LATS contained evidence of, among other things: (1) the parties' objective for their partnership, and the territorial and technological scope of the venture; (2) the nature

---

[115]  Compl. ¶ 81. I note here that the "and other related conditions" language appears in other paragraphs of the Complaint as well. *See, e.g.*, *id.* ¶ 9. The Complaint is otherwise silent, however, as to what "other conditions" beyond nocturia might come under the ambit of "Serenity."

[116]  *PharmAthene I*, 2008 WL 151855, at *13-14.

of the licenses each party would be granting and receiving, including the right to grant sublicenses; (3) the licensing fees agreed to; and (4) the structure for milestone and royalty payments.[117] In this case, there is no analogous contemporaneous evidence of several material terms of the Serenity Agreement.[118]

Moreover, where this Court in *PharmAthene* found that the parties' after-the-fact conduct supported the conclusion that the LATS may have included all the material terms of the contemplated licensing agreement,[119] the available after-the-fact evidence in this case is muddled at best. From June to November 2012, Xstelos discussed with Plaintiffs the transfer of "Serenity" in exchange for the CPEX office building located in New Hampshire and circulated draft documentation related to such a transfer. When Chappell attempted to reduce this discussed agreement to a term sheet, the parties reached an impasse, culminating in the December 19, 2012 email in which Couchman told Chappell, "Dale, you and I never discussed a license agreement. This is something new you are asking for and we are not inclined to provide. We thought we were discussing a transaction to sell 60% of the Serenity interest only. We won't provide a license

---

[117]    *Id.*

[118]    In many paragraphs of the Complaint, Plaintiffs allege that Defendants agreed to split or transfer "Serenity." By using their own term, Serenity, Plaintiffs imply in a conclusory manner that it was a defined term, without pointing to words or deeds of Defendants that manifested any shared understanding in that regard. *See* Compl. ¶¶ 3, 9-11, 43, 57, 59, 61, 62, 67, 72, 73, 86, 95, 96.

[119]    *Id.* at *14.

agreement."[120] Plaintiffs characterize Couchman's statement as a "sudden" repudiation of the agreement Plaintiffs thought they had made.[121] Based on the entirety of the factual allegations in the Complaint and the documents integral to it, however, the only reasonable inference this Court can draw from these facts is that while Plaintiffs may have had a subjective understanding of what "Serenity" meant that comports with the allegations in their Complaint, when the parties finally attempted to reduce the agreement to writing, it became clear that Defendants did not share Plaintiffs' understanding and apparently never had.

Even if Plaintiffs' description of "Serenity" were not vague in this particular respect, however, there is a more fundamental inconsistency here. In particular, it appears that "Serenity," as Plaintiffs sometimes describe it, presupposes that CPEX has greater rights vis-à-vis Allergan than are provided for under the Allergan License. The Allergan License gives CPEX the right to receive milestone payments and a fixed-rate royalty stream from Allergan based on sales resulting from its collaborative effort with CPEX, and CPEX has the ability to use Allergan's drug technology for purposes of research related to the project.[122] In terms of who actually has the ability to sell or market

---

[120] Compl. ¶ 106.

[121] *Id.*

[122] The Allergan License is a lengthy and complicated document, but it is integral to understanding the allegations of the Complaint and, therefore, may be considered on Defendants' motion to dismiss. *See* note 27 *supra.* I focus here only on some of its most relevant terms. *See, e.g.*, Allergan License §§ 7.1-7.6 (concerning the mutual granting of licenses between CPEX and Allergan) and §§ 6.1-6.6 (concerning payment rights under the License).

any resulting "Product" under the Allergan License, however, the License makes clear that only Allergan, not CPEX, has that right as to SER-120 and any other drug formulation containing Allergan's synthetic hormone molecule as the active ingredient.

In this regard, I note the requirement in Section 8.4.1 that CPEX assign "its right, title, and interest in and to all Product Technology to [Allergan]." The Allergan License defines "Product Technology" to mean all inventions, trade secrets, information, etc. that is: (1) developed in the conduct of the activities under the Research Plan; and (2) relates "solely to the Active Molecule." The Active Molecule is defined as the patented drug technology Allergan brought to the table when the joint venture embodied in the Allergan License began. The only reasonable inference that can be drawn from this contractual structure is that CPEX does not "own" SER-120 or any other drug Product containing desmopressin. Nor does it appear reasonable to infer that CPEX had the ability to transfer any ownership rights therein, other than the right to receive a portion of the anticipated royalty payments on any such Product, without extensively rewriting its License with Allergan.

It is possible, therefore, that FCB Holdings or CPEX would not even be *capable* of transferring to Plaintiffs something more than merely the rights to the milestone payments and royalties provided by the Allergan License. But, such a circumstance would conflict with the allegations in the Complaint and Plaintiffs' arguments as to what the parties were to exchange under the Serenity Agreement. For these reasons, I conclude that, unlike in the *PharmAthene* case, it is not reasonably conceivable based on the Complaint here and the reasonable inferences drawn from it that the material terms of

53

the alleged Serenity Agreement could be proven to have been sufficiently definite to comprise an enforceable contract.[123]

Because the essential terms of the Serenity Agreement have not been alleged with sufficient definiteness to render that agreement enforceable, it is not reasonably conceivable that the remedy of specific performance will be available in this case. To

---

[123] Other cases cited by Plaintiffs to support their argument that the terms of the Serenity Agreement are sufficiently definite are similarly unhelpful. In *Walton v. Beale*, for example, this Court specifically enforced an oral contract for sale of real estate between neighbors. 2006 WL 265489 (Del. Ch. Jan. 30, 2006), *aff'd*, 913 A.2d 569 (Del. 2006). In reaching its conclusion, this Court rejected the seller's argument that the contract lacked an essential term because it was clear "both parties understood that the configuration of the property would be as drawn in the record plan," which was signed by the parties and filed with the county contemporaneously with the sale. *Id.* at *5. Similarly, this Court enforced an oral contract to sell half of the stock of a Delaware corporation in *Hazen v. Miller*, 1991 WL 244240, at *2 (Del. Ch. Nov. 18, 1991). There, as to the assets to be transferred, the Court found that "the terms (1,135 shares and $50 per share) appear repeatedly and noncontroversially in the documents," (*id.*) and the defendant, "by his objective manifestations, gave [plaintiff] every reason to believe that [plaintiff] would become a 50% stockholder." *Id.* at *4. Then-Vice Chancellor Jacobs distinguished that factual situation from "a case such as *Raffles v. Wichelhaus*[,] where the disputed contract involved a ship named 'Peerless,' but in fact two ships had that same name and each contracting party reasonably intended a different ship." *Id.* (internal citation omitted).

The case at hand, with the ambiguity surrounding "Serenity," is readily distinguishable from both *Hazen* and *Walton*. Both of those cases centered on the transfer of an asset where the contemporaneous, shared understanding of the parties was clear. Plaintiffs here have not alleged non-conclusory facts that would bring this case in line with those as far as having sufficiently definite terms in the contract. *See also Hindes v. Wilm. Poetry Soc'y*, 138 A.2d 501, 503-04 (Del. Ch. 1958) (holding that "the provision for the amount of royalty payments was an essential term of the contract" between an author and publisher, and finding the alleged contract an unenforceable "agreement to agree" where the parties' conduct had "not progressed to the point where the indefiniteness in the royalty provision has been cured.").

obtain specific performance, a plaintiff must adduce clear and convincing evidence as to the essential terms of the contract.[124] Having concluded that Plaintiffs could not conceivably prove the existence of an enforceable Serenity Agreement based on the allegations in the Complaint and all reasonable inferences drawn from them, it follows ineluctably that Count II for specific performance must be dismissed, as well.

## C.    Counts VI, VII, and VIII

In Counts VI, VII, and VIII of the Complaint, which Plaintiffs plead in the alternative to Counts I and II, they seek relief for Defendants' alleged breach of the Serenity promise based on the non-contractual theories of fraud, promissory estoppel, and unjust enrichment. Based on the record currently before me, I conclude that it is not reasonably conceivable that Plaintiffs could prove the elements of any of these claims.

**1.    Neither fraud nor promissory estoppel is applicable here because Plaintiffs cannot conceivably prove reasonable reliance on the Serenity promise.**

### a.    Relevant legal principles

The elements necessary to plead a fraud claim under Delaware law are well established.

> To state a claim, the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable

---

[124] *Pharmathene I*, 2008 WL 151855, at \*15 (citing *Williams v. White Oak Builders, Inc.,* 2006 WL 1668348, at \*4 (Del. Ch. June 6, 2006)).

reliance on the representation; and (5) the plaintiff was injured by its reliance.[125]

According to Court of Chancery Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity," though "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." To satisfy Rule 9(b) at the pleadings stage, Plaintiffs must allege: "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[126]

Under the doctrine of promissory estoppel, a plaintiff must show by clear and convincing evidence that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[127] The alleged promise must be "a real promise, not just mere expressions of expectation, opinion, or assumption," and "reasonably definite and certain."[128]

Accordingly, at the motion to dismiss stage, the Court's inquiry is whether Plaintiffs could prove the elements of fraudulent inducement or promissory estoppel

---

[125]    *ABRY P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[126]    *ABRY P'rs*, 891 A.2d at 1050.

[127]    *Chrysler Corp. (Del.) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

[128]    *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009) (citations omitted).

under any reasonably conceivable set of facts, taking all non-conclusory allegations in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs.

### b. It is not reasonably conceivable that Plaintiffs could prove a claim for fraudulent inducement or promissory estoppel.

Applying the relevant law to the facts alleged in this case, I conclude that Plaintiffs have not stated a claim for fraud or promissory estoppel. Based on the record before me, it is not reasonably conceivable that Plaintiffs could prove the existence of a critical element of the applicable tests—namely, justifiable or reasonable reliance.

With respect to their fraudulent inducement claim, Plaintiffs argue, among other things, that they justifiably relied on Defendants' representations as to Serenity, because "Chappell was careful during these frantic times [in December 2010] to seek Couchman's repeated reassurance that he would stand by the Serenity Agreement even in the absence of pre-closing documentation."[129] Plaintiffs also contend that the Court should find promissory estoppel here because the Complaint "alleges that the receipt of the additional right to Serenity was 'a central precondition' to Black Horse's willingness to loan additional amounts above Plaintiffs' *pro rata* share."[130]

Neither of these allegations suffice in the circumstances of this case to meet the requirement for adequately pleading reasonable or justifiable reliance as a matter of Delaware law. In support of their arguments as to justifiable reliance, Plaintiffs cited no case in which a Delaware court, or any court, found the justifiable reliance element of

---

[129]    PAB 34 (citing Compl. ¶¶ 50-68).

[130]    PAB 36-37 (citing Compl. ¶ 64).

57

fraud or promissory estoppel to have been satisfied where an oral promise was made that directly conflicted with the plain language of a subsequent written agreement covering the same subject matter. In *H-M Wexford LLC v. Encorp, Inc.*,[131] this Court dismissed claims for fraud and breach of contract brought by an investor against the company from which he had purchased securities in a private placement.[132] The plaintiff investor had received a private placement memorandum ("PPM") before executing a formal purchase agreement that contained an integration clause in which the parties agreed that the purchase agreement was the entire understanding of the parties and no promises or representations existed other than those in the purchase agreement.[133] Granting a motion to dismiss under Rule 12(b)(6), this Court concluded that, "if [plaintiff] wanted to be able to rely upon the PPM or particular facts represented therein, it had an obligation to negotiate to have those matters included within the scope of the integration clause of the contract."[134]

---

[131]     832 A.2d 129 (Del. Ch. 2003).

[132]     The Court in *H-M Wexford* denied motions to dismiss, however, for breach of contract and fraud claims that arose not from the PPM but from alleged misrepresentations *within* the operative contract itself. *Id.* at 144-47. If anything, the distinction drawn by the Court in *H-M Wexford* (between reliance on prior representations later superseded by written agreements and representations within an agreement itself) supports my conclusion here. *Cf. ABRY P'rs*, 891 A.2d at 1055 n.46 (citing *H-M Wexford* as "allowing a claim for fraud based on alleged false representations made in a Purchase Agreement.")

[133]     *H-M Wexford*, 832 A.2d at 141.

[134]     *Id.* at 142.

As alleged in the Complaint here, the promise at the core of the Serenity Agreement was that, if Plaintiffs would make the $10 million Bridge Loan, Defendants would give an additional 60.5 percent interest in "Serenity," as that term was understood by Plaintiffs. It is not reasonably conceivable that Plaintiffs justifiably could have relied on that December 2010 promise as being enforceable while executing multiple written agreements on January 3, 2011 in which Plaintiffs disclaimed any and all prior promises, agreements, or understandings with respect to both the Bridge Loan and the post-merger operation and control of FCB Holdings, the contemplated owner of the "Serenity" assets. As with the plaintiff in *H-M Wexford*, it is not enough for Plaintiffs here to argue and allege that they, in fact, did rely on Defendants' promises. Plaintiffs must allege non-conclusory facts that enable this Court to find it reasonably conceivable that such reliance was justifiable in the face of clear contractual language in which Plaintiffs agreed there were no prior agreements or understandings. I conclude that Plaintiffs have not met that pleading burden.

As part of their answer to Defendants' argument that the plain language of the integration clauses in the Acquisition Agreements bars the breach of contract claims with respect to the Serenity Agreement, Plaintiffs contend that those clauses are not dispositive because they do not include specific and clear "anti-reliance provisions."[135] In particular, Plaintiffs argue that Delaware law holds that, "to bar a fraud claim, an integration clause must state that a party is not relying on any extra-contractual

---

[135]    PAB 27-31.

representations."[136] There may be support for that proposition, but the cases in which our courts invoke it are inapplicable here.

For example, in *Kronenberg v. Katz*,[137] this Court recognized that, "The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."[138] In that case, Chief Justice Strine, then a Vice Chancellor, addressed the question of whether "standard" integration clauses in an LLC agreement precluded the plaintiffs from reasonably relying on prior material misrepresentations by a defendant that were not incorporated into the agreement.[139] Discussing *H-M Wexford* and other cases, the Court in *Kronenberg* granted summary judgment in favor of plaintiffs on their fraudulent inducement claims, concluding that the integration clause there "does not speak in any direct way to the reliance by the plaintiffs on factual statements of" the defendants.[140]

---

[136] PAB 27.

[137] 872 A.2d 568 (Del. Ch. 2004).

[138] *Id.* at 593.

[139] The integration clause at issue in *Kronenberg* closely parallels the integration clauses of the relevant Acquisition Agreements here. *Id.* at 587 ("This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied.")

[140] *Id.* at 593.

60

The Court construed the integration clause "as simply indicating that there were no separate oral contracts and that there was no separate consideration (i.e., inducements) for entering the Agreement, other than as provided in the LLC Agreement."[141]   In *Kronenberg*, the plaintiffs allegedly relied on prior statements of fact that were clearly material.[142]   Moreover, because "Delaware's public policy is intolerant of fraud," the Court held that "the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract."[143]   The Court concluded that the integration clause there did not evince such an agreement to bar reliance on factual misstatements, but rather "simply operate[d] to police the variance of the agreement by parol evidence."[144]

This balance between competing public policy objectives—intolerance of fraud on one hand, and freedom of contract on the other—also was implicated in this Court's *ABRY Partners* decision.[145]   *ABRY Partners* is factually less analogous to the present case

---

[141]   *Id.*

[142]   *Id.* at 587 ("[I]t is clear that Katz made material misrepresentations of facts that would have been important to a reasonable investor considering committing funds . . . . That is the only rational conclusion one can draw from the record.").

[143]   *Id.* at 593.

[144]   *Id.* at 592.

[145]   *ABRY P'rs*, 891 A.2d at 1055 ("I must now consider the Buyer's argument that public policy intervenes to trump contractual freedom and to prevent that preclusion. That public policy argument continues a longstanding debate within American jurisprudence about society's relative interest in contractual freedom versus establishing universal minimum standards of truthful conduct for contracting parties.").

than *Kronenberg*, but its reasoning is important. In *ABRY*, the stock purchase agreement at issue contained the type of "anti-reliance" language lacking in *Kronenberg* (and this case), and further, the plaintiff buyers in *ABRY* conceded that the anti-reliance clause was valid and that they had not relied on any extra-contractual representations. The rub was that the plaintiffs had agreed to a provision limiting the defendant seller's liability for material misstatements of fact made *within* the contract itself. That provision required the parties to arbitrate such disputes and capped damages with respect to them.

Confronted with a material misstatement of fact by the seller defendants that fell *within* the scope of their contractual representations, Chief Justice Strine, then a Vice Chancellor, had to decide whether to dismiss a claim for rescission, based on the defendants' argument that the unambiguous language of the contract limited the available remedy to arbitration with a damages cap. Weighing the public policy of promoting efficient commerce by honoring agreements freely made by sophisticated businesspersons against the venerable principle that "fraud vitiates every contract," the Court in *ABRY* distinguished between intentional misrepresentations of fact—*i.e.*, lies— on the one hand and factual misrepresentations that flowed from reasonable error, negligence, or recklessness on the other.[146] The Court held that when a seller charged with fraud "intentionally misrepresents a fact embodied in a contract—that is, when a

---

[146]    *ABRY P'rs*, 891 A.2d at 1061-63.

62

seller lies—public policy will not permit a contractual provision to limit the remedy of the buyer to a capped damage claim."[147]

Consistent with the teachings of *Kronenberg* and *ABRY Partners*, I construe the integration clauses of the Commitment Letter, Merger Agreement, Stockholders' Agreement, and Bridge Loan Agreement to indicate that there were no separate oral contracts regarding the subject matter of those Agreements, and that there was no separate consideration or inducement for entering into those Agreements. Like the integration clause in *Kronenberg*, the language agreed to by the parties in the Acquisition Agreements does not contain sufficient anti-reliance language to bar a claim based on "*material misstatements of fact*."[148] "The teaching of this court," however, "is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."[149]

---

[147] *Id.* at 1036. The misstatement at issue in *ABRY* pertained to the financial statements of the target company. In particular, the seller defendants influenced the company management to overstate certain numbers to show an EBITDA multiple that would make the company appear more attractive to the buyer. *See id.* at 1051. The Court there stated that allowing the defendant to immunize itself from a claim arising out of that misrepresentation "would be to sanction unethical business practices of an abhorrent kind and to create an unwise incentive system for contracting parties." *Id.* at 1035.

[148] *Kronenberg,* 872 A.2d at 594 (emphasis added).

[149] *ABRY P'rs,* 891 A.2d at 1057.

The problem for Plaintiffs in this case is that the Complaint and related documents make clear that they promised, in several clear integration clauses of negotiated agreements, that they would not rely on promises and agreements outside of those writings. The statements the Cheval Plaintiffs rely on were not misrepresentations of material *fact* akin to those in *Kronenberg*, but rather prior parol evidence that would vary the extant terms in the subsequent integrated writings.[150] By attempting to plead around the plain language of their written agreements with allegations of "fraud," Plaintiffs seek to shirk the bargain evidenced by the written agreement in favor of a "but we did rely on those other representations" claim.

To avoid this conclusion, Plaintiffs argue that this case fits within the reasoning of cases like *Kronenberg* because their fraud claim is about Defendants' "present state of mind" rather than "future intent."[151] This contention is not supported by the case law. As alleged in the Complaint, the Serenity Agreement calls for Black Horse to provide the $10 million Bridge Loan in exchange for the Xstelos Entities' and Couchman's "express agreement to effectuate the transfer of an additional 60.5% of Serenity"[152] to Plaintiffs.

---

[150] *See Kronenberg*, 872 A.2d at 592 (stating that a standard integration clause "simply operates to police the variance of the agreement by parol evidence" but does "not operate to bar fraud claims based on *factual statements* not made in the written agreement," where the "factual statement" at issue was an independent feasibility study the defendants represented was produced by third-party experts but was in fact fabricated by the defendants to induce the plaintiffs to invest) (emphasis added).

[151] PAB 28-29.

[152] Compl. ¶ 135.

As alleged, those are "promises."[153] In the context of the often "frantic times" leading up to the signing of a merger agreement by sophisticated businesspersons, such representations—both oral and written—are so numerous and varied that when the parties are coalescing around a final written expression, there is great utility in having all prior promises, agreements, and understandings wiped away and merged into the final written agreement.[154]

The alleged misrepresentations at issue here are not the sort of prior "representations" that animated the rulings in cases like *ABRY Partners*, which dealt with materially incorrect financial statements, reliance on which caused the plaintiff buyers to overestimate how much the target company was worth. This Court aptly reasoned that "there is little support for the notion that it is efficient to exculpate parties when they lie

---

[153]    *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 2 ("A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in believing that a commitment has been made."); *see also Carrow v. Arnold*, 2006 WL 3289582 (Del. Ch. Oct. 31, 2006) ("Prior oral promises usually do not constitute false representations of fact that would satisfy the first element of fraudulent misrepresentation. A viable claim of fraud concerning a contract must allege misrepresentations of present facts (rather than merely of future intent) that were collateral to the contract and which induced the allegedly defrauded party to enter into the contract.") (internal quotations omitted), *aff'd*, 933 A.2d 1249 (Del. 2007).

[154]    *See, e.g.*, 11 WILLISTON ON CONTRACTS § 33:1 (4th ed.) ("The [parol evidence] rule is founded on experience and public policy, created by necessity, and designed to give certainty to a transaction that has been reduced to writing by protecting the parties against the doubtful veracity and uncertain memory of interested witnesses. . . . By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments.") (internal quotation marks omitted).

about *the material facts* on which a contract is premised."[155]   There is, however, considerable support in logic and the law for the notion that it is efficient to hold parties to the promises they make in an integrated writing, and only those promises.  If Plaintiffs' argument on this point were followed to its natural conclusion, this Court would be unable to bar a claim that, as consideration for making the Bridge Loan, Defendants had promised in December 2010 to effectuate a transfer of $1 million cash from FCB Holdings to Cheval Holdings or Black Horse at some point after the Merger, even though the parties did not mention that promise in the written and integrated Commitment Letter and Bridge Loan Agreement.  Entertaining a claim that so plainly conflicts with the language of those two agreements and the Stockholders' Agreement would render the integration clauses contained in them mere surplusage—a result that our canons of contractual interpretation strongly discourage.[156]

This Court's decision in *Narrowstep, Inc. v. Onstream Media Corp.*,[157] relied on by Plaintiffs for the proposition that they have pled a material misrepresentation of fact, supports my conclusion.  In *Narrowstep*, this Court refused to dismiss claims for breach of contract and fraudulent inducement where defendants allegedly had signed a merger agreement to acquire the plaintiff company and then, under the guise of preparing to

---

[155]   *ABRY P'rs*, 891 A.2d at 1062 (emphasis added).

[156]   *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

[157]   2010 WL 5422405 (Del. Ch. Dec. 22, 2010).

66

close on the merger, took operational control of and stripped the company of its valuable assets before backing out of the signed merger agreement.[158]

Noting that under Delaware law "a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations,"[159] this Court reasoned that, "If the Complaint merely alleged that the parties had a contract and Onstream intended not to follow through with its obligations under the Agreement and nothing more, Narrowstep's fraud claim would be an impermissible bootstrap of its breach of contract claim."[160] The conduct alleged in *Narrowstep*, however, went "beyond a mere intention not to comply with the terms of the Agreement." The gravamen of the fraud complaint there was not about the future performance or non-performance of the merger agreement; it was about the fact that the defendants were misrepresenting facts about their management of the plaintiff's business during the period leading up to the contemplated closing.[161] Taking the allegations in the Complaint as true, Plaintiffs here merely allege that the Serenity Agreement was a contract and that Defendants never intended to follow through with their alleged

---

[158] *Id.* at *15.

[159] *Id.* (internal quotation marks omitted) (quoting *Iotex Commc'ns, Inc. v. Defries,* 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998)).

[160] *Id.*

[161] *Id.* ("This conduct, if true, goes beyond a mere intention not to comply with the terms of the Agreement; it alleges that Onstream intended to plunder Narrowstep and bought time to do so by stringing it along under the guise of working toward an expeditious closing pursuant to the Agreement. That is, the Agreement is not the source of Narrowstep's fraud claim, but rather the instrument by which Onstream perpetrated its broader scheme to loot Narrowstep.")

obligations under it from the very outset in December 2010.[162]  Thus, the *Narrowstep* case affords no support for Plaintiffs' argument.[163]

Taking Plaintiffs' allegations as true and drawing all inferences in their favor, I cannot conclude, consistent with cases like *Kronenberg*, that they could prove a fraudulent inducement claim under any reasonably conceivable set of facts, given how directly and completely the terms of the alleged Serenity Agreement conflict with the plain language of the Acquisition Agreements.  I therefore dismiss Counts VI and VII of the Complaint.

2.     **Unjust enrichment is inapplicable because the Commitment Letter and Bridge Loan Agreement are the measure of Plaintiffs' rights with respect to the $10 million Bridge Loan.**

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental

---

[162]   *See* Compl. ¶¶ 14-16 ("After the deal closed, however, Couchman and Footstar began to demonstrate that they had no intention of performing the Serenity Agreement. . . . Couchman never had any intention on following through on the promise. . . ."); ¶ 67 ("Footstar and Couchman never intended to honor their agreement with Cheval and the Chappells.").

[163]   Other cases cited by Plaintiffs for the same proposition are similarly unavailing. *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *13-17 (Del. Ch. Dec. 30, 2010) (distinguishing between two fraud claims, finding that one was legally insufficient because it merely alleged statements constituting a promise without specific facts supporting an inference of present intent to break that promise, while the other was well-pled because it had such specific factual allegations); *Carrow v. Arnold*, 2006 WL 3289582, at *5-11 (Del. Ch. Oct. 31, 2006) (finding a written agreement of real property sale to be integrated, and refusing to admit prior oral statements to modify its terms, rejecting a fraudulent inducement claim), *aff'd*, 933 A.2d 1249 (Del. 2007).

principles of justice or equity and good conscience."[164]  To state a claim for unjust enrichment, a plaintiff must plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[165]  If a contract governs the relationship between a complainant and the party who allegedly unjustly enriched himself, the contract is "the measure of the plaintiff's right."[166]

In Count VIII, Plaintiffs charge Defendants with unjust enrichment as an alternative to their breach of contract theory pertaining to the Serenity Agreement. Defendants seek dismissal of this claim, arguing that Plaintiffs' rights under the Bridge Loan agreement preclude them from stating a claim for unjust enrichment, and that, in any event, Plaintiffs have not been impoverished.  Plaintiffs disagree.  They assert that, "The Bridge Loan Agreement is only a manifestation of the consideration Plaintiffs provided to Defendants as part of the Serenity bargain," and the Bridge Loan Agreement "neither represents an agreement between the parties nor governs the transfer of interest in Serenity—the matter in dispute."[167]

Plaintiffs' argument elides the proper inquiry under the law of unjust enrichment. Their claim is that by making the $10 million Bridge Loan, which was the only consideration Plaintiffs are alleged to have provided in connection with the Serenity

---

[164]  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

[165]  *Addy v. Piedmonte*, 2009 WL 707641, at *22 (Del. Ch. Mar. 18, 2009).

[166]  *Id.*

[167]  PAB 41.

Agreement, they enriched Defendants in that Plaintiffs' loan "permitt[ed] the merger to be finalized," thereby allowing Footstar to "avoid dissolution (and salvage its business)."[168] Plaintiffs further aver that they were impoverished, because Defendants unjustly retained the 60.5 percent of "Serenity" that Plaintiffs believe they should have received.

To survive a motion to dismiss, each element of an asserted claim must be pled.[169] The central fact Plaintiffs allege in support of their claim for unjust enrichment, however, is that they made the $10 million Bridge Loan. But, as discussed in several parts of this Memorandum Opinion, the terms governing the Bridge Loan are set forth in the Commitment Letter, the Bridge Loan Agreement, or both, which Plaintiffs expressly agreed embodied the entire understanding of the parties with respect to the subject matter thereof. The subject matter of those integrated agreements was the $10 million Bridge Loan. By their terms, the Commitment Letter and the Bridge Loan Agreement contain the entire understanding, and the measure of Plaintiffs' rights, concerning the Bridge Loan. These rights included, among other things: (1) the right to receive interest at a rate of twenty percent per annum; (2) repayment of principal within four days after the closing date of the Merger; (3) a fee of three percent of the Loan amount ($300,000); and (4) *pari passu* treatment with respect to the $3 million bridge loan made by Footstar.[170]

---

[168] *Id.*

[169] *Crescent/Mach I P'rs, L.P.*, 846 A.2d at 972.

[170] Commitment Letter, Ex. A, "Summary of Terms."

There is no allegation in the Complaint that Plaintiffs did not receive these elements of consideration. Therefore, Plaintiffs cannot state a claim for unjust enrichment based on the fact that they made the Bridge Loan.

### D.    Count III

In Count III, Plaintiffs seek damages for Xstelos's alleged breach of the Consulting Agreement. To state a claim for breach of contract under Delaware law, a plaintiff must allege the existence of a contract, the breach of an obligation imposed by that contract, and resultant damage to the plaintiff.[171] The existence of the Consulting Agreement is not disputed. Plaintiffs allege that Cheval Holdings has performed all of its obligations under the Consulting Agreement, that Cheval Holdings has made repeated demands to be paid in accordance with the terms of that Agreement, and that Xstelos has failed to make such payment. Cheval Holdings alleges that it has suffered damages of $2,062,500 as a result of Xstelos's failure to make proper payment.

Defendants seek dismissal of this Count as moot. They submit that the Consulting Agreement only requires payment to be remitted to an escrow account, that such an account was created on September 6, 2013, and that 100 percent of the requisite funds have been transferred to that account.[172] Plaintiffs dispute whether this purported payment was made in accordance with the terms of the Consulting Agreement.

---

[171]    *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

[172]    Defs.' Opening Br. 49.

At this motion to dismiss stage, the Complaint's non-conclusory factual allegations "generally defin[e] the universe of facts that the trial court may consider."[173] The Court, therefore, may not take into consideration facts adduced only in Defendants' briefing on the pending motion. Based on the facts that may be considered on Defendants' motion to dismiss, I conclude that it is reasonably conceivable that Plaintiffs will be able to prove a breach of the Consulting Agreement. Accordingly, I decline to dismiss Count III under Rule 12(b)(6).

Plaintiffs also plead, in Count VIII, unjust enrichment with regard to the consulting services they provided, as an alternative to their claim in Count III for breach of the Consulting Agreement. Because Plaintiffs have stated a claim for breach of contract as to the Consulting Agreement, I dismiss Count VIII, insofar as it pertains to the Consulting Agreement, on the same grounds that I dismissed Plaintiffs' unjust enrichment claim pertaining to the Commitment Letter and the Bridge Loan Agreement.

### E.     Counts IV and V

#### 1.     The Complaint states a claim for breach of contract with respect to the Stockholders' Agreement.

In Count IV, Plaintiffs seek damages for Xstelos's and FCB Holdings' alleged breach of the Stockholders Agreement. In that respect, Plaintiffs must allege the existence of a contract, the breach of an obligation imposed by that contract, and resultant damage.[174] Plaintiffs accuse Xstelos of breaching the Stockholders' Agreement in

---

[173] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[174] *Kuroda*, 971 A.2d at 883.

various ways, as recited in Section I.B.5 *supra*. They also allege that Cheval Holdings "has suffered and continues to suffer damages in an amount to be proven at trial" for these breaches.[175] Defendants argue that Count IV should be dismissed because: (1) the Complaint's allegation as to damages is conclusory; and (2) the claim for breaching Section 2.6 is moot in that Plaintiffs received the 2011 and 2012 budgets in the third quarter of 2012. Neither of these arguments is persuasive.

Contract damages are well-pled where, "based on the facts that [plaintiff] has alleged, it can reasonably be inferred that, if those facts are true, [plaintiff] suffered damages."[176] Plaintiffs aver that Xstelos: (1) entered into related party transactions without Cheval Holdings' consent; (2) failed to present annual budgets for CPEX and FCB Holdings; (3) caused FCB Holdings and its subsidiaries to make large capital expenditures without consent of Cheval Holdings; and (4) failed to provide administrative services to CPEX at Xstelos's expense. Assuming those allegations are true, as I must, it is at least reasonably conceivable that Cheval Holdings suffered injury and could prove damages.

The argument that the 2011 and 2012 budgets were supplied in late 2012 is insufficient to support a reasonable inference that there was no breach of Section 2.6, which requires that "[b]efore the commencement of each fiscal year," the budget must be

---

[175]    Compl. ¶ 158.

[176]    *H-M Wexford*, 832 A.2d at 144 n.28.

73

adopted.[177]  Plaintiffs, therefore, conceivably could prove that they were harmed by the delayed adoption of the budgets.  The extent of the injury and whether it may be redressed by money damages cannot be established conclusively at this stage of the proceeding, but it need not be.  It is sufficient that it is reasonably conceivable Plaintiffs could prove they suffered damages as a result of the alleged breach.  Accordingly, I decline to dismiss Count IV.

## 2. The Complaint states only a narrow claim for breach of the implied covenant of good faith and fair dealing with respect to the Stockholders' Agreement.

Plaintiffs purport to plead a second claim, Count V, arising out of the Stockholders' Agreement.  Specifically, they charge Xstelos and FCB Holdings with breach of the implied covenant of good faith and fair dealing for the manner in which FCB Holdings declared and paid dividends in September and October 2012.

The Delaware Supreme Court has held that the implied covenant "seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[178]  Nevertheless, the implied covenant "cannot be employed to impose new contract terms

---

[177] Stockholders' Agreement § 2.6.

[178] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (quoting with approval *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440-42 (Del. Ch. 2012), *rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)); *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) ("[A] party may only invoke the protections of the covenant when it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter.") (internal quotation omitted).

74

that could have been bargained for but were not."[179] Delaware courts do not apply the implied covenant "to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'"[180]

Under Delaware law, one deciding an implied covenant claim must ask "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[181] The inquiry is temporally constrained in the sense that the court "does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[182] At the motion to dismiss stage, I consider whether it is reasonably conceivable based on the record before me that Plaintiffs could prove a claim for breach of the implied covenant. Generally, "to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied

---

[179]   *Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 959 (Del. 2014).

[180]   *Winshall*, 76 A.3d at 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.,* 861 A.2d 1251, 1260 (Del. 2004)).

[181]   *Id.*

[182]   *Gerber*, 67 A.3d at 418-19; *see also Winshall*, 76 A.3d at 816 ("[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal.").

75

contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[183]

Plaintiffs allege that Defendants caused FCB Holdings to declare and pay the September and October 2012 cash dividends before Cheval Holdings could redomicile its ownership of FCB Holdings into Ouray. As a result, Cheval Holdings incurred $487,500 more in taxes than it would have if the dividends were delayed as Plaintiffs requested. According to Plaintiffs, there is an implied term in the Stockholders' Agreement obligating FCB Holdings to declare or pay dividends "in good faith to protect the reasonable expectations of the stockholders, including Cheval."[184] They assert that Defendants violated that term by designing the dividend "to harm Cheval," and that they thereby acted in bad faith under Delaware law.[185]

As noted *supra*, one of the "Negative Covenants" in the Stockholders' Agreement for which Cheval Holdings bargained with Footstar or Xstelos was that FCB Holdings would not cause "the declaration or payment of any dividends or distributions that are not paid pro rata to [FCB Holdings'] stockholders."[186] A separate section of the Agreement, entitled "Distributions," states that, "[t]o the extent proceeds are available, the Company shall cause the Surviving Corporation [defined as CPEX] to make payments as follows:

---

[183]  *Blaustein v. Lord Baltimore Capital Corp.*, 2012 WL 2126111, at *5 (Del. Ch. May 31, 2012).

[184]  Compl. ¶ 162.

[185]  PAB 43-44 (citing Compl. ¶¶ 162-63).

[186]  Stockholders' Agreement § 2.2(o).

(i) expenses and taxes and (ii) distributions to the Company [FCB Holdings] to the extent permitted by the Loan Agreement."[187] In the next sentence, the parties agreed that FCB Holdings's Board of Directors "shall make distributions from time to time to its stockholders to the extent proceeds are available and deemed advisable by the Company's Board; <u>provided</u> that any such distributions shall be apportioned among the stockholders pro rata in accordance with their respective percentage interests of the Common Stock."[188]

In attempting to plead that Defendants violated the Stockholders' Agreement by causing the dividends to be paid in September and October 2012, Plaintiffs ask this Court to impose new contract terms that could have been bargained for but were not. The plain language of Section 5.5 shows that, at the time of contracting, the parties *did* consider the issues of: (1) when distributions should be made; and (2) whether there were any limits to the board's discretion in deciding to make distributions. They agreed that distributions should be made "from time to time" when such distributions are "deemed advisable" by the board. Knowing that the board was split 2-1 between Xstelos appointees and Cheval Holdings appointees, and reasonably foreseeing that they may not always agree, the parties limited the board's discretion in two ways: (1) distributions could only be made "to the extent proceeds are available,"; and (2) absent consent of the stockholders, distributions had to be made "pro rata."

---

[187]  Stockholders' Agreement § 5.5.

[188]  *Id.*

77

Under Delaware law, at this procedural stage, I must ask whether it is reasonably conceivable that Plaintiffs could show from the relevant contract language that, at the time of contracting, the parties clearly would have agreed that if the board wished to make a distribution in the future, Cheval Holdings would have the right to compel the board to delay the distribution in order to accommodate Cheval Holdings's preferences or to best suit its idiosyncratic needs. I conclude that the answer to this question is no. The parties agreed that dividends could be paid when it was deemed advisable by the board, but that, in any event, they had to be paid pro rata and only to the extent proceeds were available. If the parties had wanted to give more protection to Cheval Holdings with respect to the timing of future dividends, or the resolution of a disagreement as to when a dividend should be paid, they easily could have included appropriate limiting language in Section 5.5.

Plaintiffs point to no Delaware case that supports their application of the implied covenant on the facts alleged here. To the contrary, in cases as recent as *Blaustein v. Lord Baltimore Capital Corp.*, similar implied covenant claims have been dismissed. There, the plaintiff raised an implied covenant claim based on a shareholders' agreement that contained a provision dealing with the repurchase of stock, in which it was agreed such a repurchase would be on terms "agreeable to the Company and the Shareholder," provided that all repurchases must be approved either by a majority of the board or consent of holders of at least 70 percent of the stock. [189]

---

[189] *Blaustein*, 2012 WL 2126111, at *2.

At the motion to dismiss stage, this Court dismissed the implied covenant claim insofar as the plaintiff attempted to supplement the contract provision with a term that required the board to repurchase at a *particular price*, because the contract provided that the terms of repurchases would be at the discretion of the parties.[190] The Court declined to dismiss the implied covenant claim, however, insofar as it attempted to read into the applicable contract language a term that required the Board to "consider" repurchases, given that the contract gave the directors power to approve repurchases at duly called board meetings. It was reasonably conceivable that the board was in breach of the implied covenant because it allegedly failed even to present or put up for consideration Blaustein's proposed repurchase. The Court found that it was possible such consideration impliedly was required by the contract's allocation of approval power to the directors.[191]

---

[190] *Id.* at *5.

[191] *Id.* Thus, the Court granted in part the defendants' motion to dismiss the plaintiffs' implied covenant claims, and later granted summary judgment as to the remainder of the implied covenant claim. The Supreme Court later concluded that both of Blaustein's implied covenant arguments (the "particular price" term and the "good faith consideration" term) were legally insufficient. The Supreme Court stated, "Here, the parties did consider whether, and on what terms, minority stockholders would be able to have their stock repurchased. Paragraph 7(d) does not contain any promise of a 'full value' price or independent negotiators. Because the implied covenant does not give parties the right to renegotiate their contracts, the trial court correctly denied Blaustein's proposed new claim.") *Blaustein*, 84 A.3d at 959. I follow the Supreme Court's reasoning in this regard.

Plaintiffs' argument here is that the Stockholders' Agreement should be read as containing an implicit term that in declaring and paying dividends FCB Holdings should accommodate the interests of specific stockholders, like Cheval Holdings, to the maximum extent feasible. Just as the contract provision in *Blaustein* could not be read to implicitly require a specific repurchase price, the Stockholders' Agreement here cannot conceivably be read to require the specific timing of dividends sought by Plaintiffs, where the parties explicitly provided the Board discretion as to this issue, and did not reserve any further rights to Cheval Holdings. Accordingly, Count V should be dismissed, to the extent that it seeks to impose a specific timing constraint on the Board's discretion to declare and pay dividends, or a requirement that the interests of specific stockholders must be accommodated.

I decline, however, to dismiss Count V to the limited extent that it includes an allegation of bad faith exercise of discretion on the part of Defendants. Plaintiffs allege that Defendants had no corporate purpose or valid business reason to declare FCB Holdings's dividends in September and October 2012, and that the timing was chosen out of a desire to harm Cheval Holdings. While the implied covenant of good faith and fair dealing cannot be invoked to provide contract terms that the parties failed to negotiate for, it is nevertheless the rule that, in situations where discretion is allocated to a contract party, "The implied covenant requires that a party refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of its bargain. *When exercising a discretionary right, a party to the contract*

*must exercise its discretion reasonably.*"[192]  At the motion to dismiss stage, I must draw all reasonable inferences in favor of Plaintiffs.  While Plaintiffs ultimately may fail to meet their burden of proving that Defendants' motivation in declaring the 2012 dividends was to cause harm to Cheval Holdings, it is not inconceivable based on the facts as alleged.  I therefore decline to dismiss Count V insofar as it pleads a breach of the implied covenant based on Defendants' allegedly bad faith conduct with respect to the 2012 dividends.

## III.    CONCLUSION

Plaintiffs have failed to state a claim upon which relief can be granted for breach of contract, fraudulent inducement, promissory estoppel, or unjust enrichment concerning the alleged Serenity Agreement.  I therefore dismiss with prejudice Counts I, II, VI, VII, and VIII of the Complaint.  Plaintiffs also have failed to state a claim upon which relief can be granted for breach of the implied covenant of good faith and fair dealing with respect to the Stockholders' Agreement with the limited exception stated in Section II.E.2 *supra,* regarding Defendants' allegedly bad faith exercise of their discretion to declare a dividend.  Subject to that exception, therefore, I dismiss Count V with prejudice.  Finally, Plaintiffs have adequately pled breaches of the Consulting Agreement and the Stockholders' Agreement.  Thus, I deny Defendants' motion to dismiss Counts III and IV.

**IT IS SO ORDERED**.

---

[192]    *Gerber*, 67 A.3d at 419 (quoting *ASB Allegiance Real Estate Fund*, 50 A.3d at 441) (emphasis in original).